## BLAESS v. DOLPH.

MASTER AND SERVANT—WORKMEN'S COMPENSATION LAW—INFECTION —UNDERTAKER'S ASSISTANT—COURSE OF EMPLOYMENT.

Where deceased, an undertaker's assistant, died from a virulent type of streptococcus infection, testimony that deceased helped his employer handle the body of a person who had died of the same infection, that the sharp-edged tools used in embalming the body were cleaned by him, that he had a slight cut in the finger through which the

infection came, that such virulent infection could come only from contact with a dead body, that the only dead bodies handled by him was in the course of his employment, that within 36 hours he began to suffer from the infection, *held*, sufficient to justify the finding of the industrial accident board that deceased received the infection in the course of his employment, entitling his widow to compensation under the workmen's compensation law.[1]

Certiorari to Industrial Accident Board. Submitted January 10, 1917. (Docket No. 84.) Decided March 29, 1917.

Bertha Blaess presented her claim for compensation against Ray A. Dolph for the accidental death of her husband in defendant's employ. From an order granting compensation said defendant and the Fidelity & Casualty Company of New York, insurer, bring certiorari. Affirmed.

*Chas. H. Ruttle* (*Florian, Moore & Wilson*, of counsel), for appellants.

*Arthur Brown,* for appellee.

STONE, J. In this case a writ of certiorari was issued to the industrial accident board, inquiring into the regularity and merits of an award for compensation made to the claimant, as the result of the death of her husband, Herman O. Blaess, an employee of Ray A. Dolph, one of the defendants herein. The defendant Dolph was an undertaker at Ann Arbor, and had employed claimant's husband for over one year as his assistant. Both parties were operating under the terms of the workmen's compensation act, defendant Dolph being insured by the defendant the

---

[1]On workmen's compensation acts, generally, see extensive note in L. R. A. 1916A, 23; particularly as to injuries "arising out of and in the course of" the employment, see p. 232 of same note.

Fidelity & Casualty Company of New York. Claimant's husband died on December 8, 1915, from a virulent type of streptococcus infection. In its petition for the writ of certiorari of the defendant the Fidelity & Casualty Company it is claimed:

(1) That there was no testimony introduced before the committee on arbitration or the industrial accident board from which it might be concluded that the injury to claimant's deceased arose out of and in the course of his employment.

(2) That the injured himself did not know where, or when he received the injury and infection; and, although it was amply proven that he might have received it in the course of his employment, there is no testimony upon which a legal conclusion can be based that he did so receive it.

The return of the industrial accident board to the writ contains the following:

"We hereby further certify and return that from the evidence submitted we made the following finding of facts: That said Herman O. Blaess was employed by respondent Ray Dolph at the time of the accident complained of, as assistant undertaker at the city of Ann Arbor; that on the 1st day of December, 1915, in the course of his employment, Blaess cleaned and sterilized instruments which had been used by his employer to embalm the body of a woman by the name of Mrs. Roy; that Mrs. Roy died from streptococcus infection on November 30, 1915; that prior to the 2d day of December, in a manner not disclosed by the evidence, Mr. Blaess received a cut upon his ring finger of the left hand; that Mr. Blaess died on the 8th day of December, 1915, from a virulent type of streptococcus infection. We are satisfied from the circumstances as disclosed by all of the evidence, and find as a fact that Mr. Blaess became infected from streptococcus infection on the 1st day of December, 1915, by accidentally becoming infected with said germ while cleaning the instruments which had been used upon the dead body of Mrs. Roy, who had died of streptococcus infection; that the infection from which

Mr. Blaess died was the type which comes from the second incubation, that is, this type of germ comes from an infection from a dead body; that the only dead bodies disclosed by the evidence that Mr. Blaess had anything to do with were those that he had to do with during the course of his employment, which eliminates, in the judgment of the board, with reasonable certainty, that he may have received it from a source outside of his employment. And therefore the industrial accident board finds that the streptococcus infection entered the body of the deceased while he was working for his said employer, and that this particular type of infection was one of the dangers of the undertaking business, an accident which arose out of and in the course of his employment."

It is the contention of defendants that during all of this year there had been an epidemic of streptococcus infection at Ann Arbor, in which many people had died, the germs of which were so virulent that death usually resulted in a very short space of time, that the sources of infection were so many that the claimant's physician could not enumerate them, and that there was no testimony which would permit the sustaining of an award except on the basis of conjecture, speculation, and the merest guess. A careful reading of the testimony will show that the claim that there had been, or then was, an epidemic of streptococcus infection at Ann Arbor is not sustained. It did appear that during the two years previous there had been "several of them, and the most of them had died." There was no evidence that there was on November 30, 1915, any other case than that of Mrs. Roy, who died about noon of that day. The body of this woman had been embalmed by Mr. Dolph and his wife that afternoon, and Mr. Dolph himself testified that Mr. Blaess cleaned the instruments that had been used in the Roy case, "sterilized them, and boiled them and put them in my grips." Mr. Dolph testified:

"*Q.* Will you describe to the commission of what

your instruments consist, the character of the instruments, whether they are instruments with a dull edge, or a keen edge?

"A. They are keen-edged instruments, most of them.

"Q. How many?

"A. Why, what an ordinary undertaker would use, well, quite a kit of instruments. That would take quite a little bit of time. We have to carry nearly as much as a surgeon would carry, the scalpel, and knives, and different instruments. * * * All the instruments that I used on this case were put in a separate grip and sterilized by Mr. Blaess after I got home. I always sterilized all instruments and everything used on a case when we got through with it.

"Q. Did Mr. Blaess do that?

"A. Yes, sir; that night. I got home about 5 o'clock. Then he had this man Smith."

It appears that a man by the name of Smith had died that day at the University Hospital, and Mr. Blaess had taken that body to the medical building for an autopsy, and had then brought it to the undertaking rooms of Mr. Dolph. There is no evidence or claim that the man Smith had died of, or been afflicted with, streptococcus infection. A man by the name of Wagner had died on November 16th or 17th, some two weeks before, from this infection. He was a butcher— had cut himself, and became infected and died of the infection—and Mr. Blaess had assisted in embalming the body. This was about two weeks before Mr. Blaess' infection. Mr. Dolph testified that Mrs. Roy's funeral was on December 3d, and that 'Mr. Blaess helped him dress and put her body in the casket. There was evidence to the effect that Mrs. Roy died of streptococcus infection, that the sharp-edged instruments used in embalming her body were immediately thereafter handled and cleaned by Mr. Blaess; that within 36 hours thereafter he began to suffer from a virulent streptococcus infection which came through a small cut in his finger, which cut was received in a manner

not disclosed by any direct evidence; that such virulent infection could only come, according to the medical testimony, directly from a body containing a streptococcus infection; and that no other case of streptococcus infection was shown to have existed where Mr. Blaess could have acquired the infection, as it would develop within 24 to 48 hours, and might develop sooner than 24 hours. Dr. Gates, who attended the deceased from the beginning, testified that deceased had a small sharp cut on the ring finger of his left hand, which, when he first saw it on December 2, was red and inflamed. His diagnosis of the trouble was:

"Streptococcus septicemia, gaining entrance through this cut in this finger, escaping the lymphatic glands in his arm and lodging in the lymphatic glands in his neck and breast."

He testified that the deceased was infected with a very virulent strain of streptococcus, as appeared from the fact that it escaped the lymphatic glands in the arm and lodged in the neck; that germs which lie about the outside of bodies are partly deadened by the action of the sunlight, and produce a less virulent infection, but that when a germ is put through a body, and is then taken from that body and put into another body, it is very active, and will produce "a great deal of trouble in a short time. That must have been the case in this case." He also testified that such active germs could not have been picked up from the street, or anything like that, but must have come from some active source immediately, and that there were no other active sources from which such germs could come, except a body.

We cannot quote all of the testimony upon this branch of the case as it is lengthy, but do quote the following:

Dr. Gates testified:

"*Q.* This germ—you said that this germ is a very virulent germ, and wouldn't come from the outside, that is, wouldn't come from the dust, or the earth, or from the table here, is that it?

"*A.* That is it.

"*Q.* Where would it come from?

"*A.* It would probably come from some direct source of infection, for instance, if it had been in another body, and had become virulent in that body, a live germ."

On cross-examination he testified:

"*Q.* Isn't it possible that this infection in Mr. Blaess could have been acquired some place else?

"*A.* I don't believe it. I sincerely don't believe it. The whole cause is—if you had followed it through as I did, if you had laid awake as many nights and thought of it as I did, you would know more about it. I tell you this man was infected in this finger, and it must have come from some body. I don't think that germ was lying around in the dust, or on a box or something of that kind. That germ got busy at once."

The claimant testified that she first saw the cut on the finger of her husband on the early morning of December 2d, when he complained of its paining him. She described it as a clean cut, as though made with a sharp instrument. There was no evidence that Mr. Blaess used gloves when handling or cleaning the embalming instruments, but claimant testified that he told her he did.

Counsel for appellants say there was no connection between Mrs. Roy's case and the infection received by Mr. Blaess. We are unable to agree with this contention. We think there was some evidence of this connection. We recognize the rule as stated in *McCoy v. Screw Co.*, 180 Mich. 454, 458 (147 N. W. 572, 573, L. R. A. 1916A, 323) that:

"The burden of furnishing evidence from which the inference can be legitimately drawn that the injury

arose 'out of and in the course of his employment' rests upon the claimant."

We are of the opinion that an inference favorable to the claimant can be arrived at from the evidence in the case, without indulging in any guess or speculation. Germs cannot be traced in their individual wanderings, like persons. No one ever saw a germ go from a source of infection to its victim's body. Means and sources of infection are, as a general rule, based on observed conditions.

In our opinion the evidence was sufficient to justify the board in reaching the conclusions stated by it in its return to the writ. At least it cannot be said that there was no legal evidence upon which to base such conclusion.

The award of the industrial accident board is affirmed.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.