MILLER v RADIKOPF

Docket No. 55576. Argued January 7, 1975 (Calendar No. 3).—Decided May 5, 1975.

In December 1970 plaintiff Lewis F. Miller and defendant Ronald L. Radikopf began to sell Irish Sweepstakes tickets. For every 20 tickets they sold, they received two free tickets. Each would place his name upon one. In June 1972, defendant won approximately $487,000. Plaintiff alleged and defendant denied an oral agreement between them that the free tickets would be jointly owned and that all prizes won by either would be divided equally, and requested that a constructive trust be impressed upon half that amount. The Ottawa Circuit Court, Raymond L. Smith, J., found the contract illegal and granted defendant summary judgment. The Court of Appeals, T. M. Burns, P. J., and Holbrook and McGregor, JJ., affirmed (Docket No. 15671). Plaintiff appeals. *Held:*

1. Irish law does not prohibit the payment of money to holders of winning sweepstakes tickets, and the law of this state does not prohibit the holder of a winning ticket from receiving proceeds paid voluntarily by a lottery. There being no statute barring enforcement of the claim asserted in this case, the question whether its enforcement would be in accord with public policy is for judicial decision.

2. Neither party is attempting to enforce the antecedent contracts, so their possible illegality is of no concern here. A promise to share winnings voluntarily paid by the Irish promoter constitutes legal consideration, and public policy would not be offended by the enforcement of the claimed agreement.

3. Judicial nonenforcement of agreements deemed against public policy might tend to discourage agreements to split winnings, but would not discourage the buying and selling of

REFERENCES FOR POINTS IN HEADNOTES
[1] 38 Am Jur 2d, Gambling §§ 61, 267, 271.
[2–5, 10, 11] 38 Am Jur 2d, Gambling §§ 186–190. Construction and application of statutes permitting specified forms of betting. 117 ALR 828.
[6–9] 17 Am Jur 2d, Contracts § 236.

sweepstakes tickets. No interest of the state would be served by nonenforcement of the claim asserted here.

4. A contractual claim to a share of money legally paid by the Irish Sweepstakes and legally possessed by the defendant may be enforced.

M. S. Coleman, J., dissented on the grounds that public policy on lotteries has been fixed by statute and that policy is against lotteries other than those conducted by the state. The prize in dispute is an integral part of the illegal sale of lottery tickets. The courts should not be available to enforce an agreement to share proceeds of an illegal activity, and the parties should be left where they are found.

Reversed and remanded for trial.

51 Mich App 393; 214 NW2d 897 (1974) reversed.

OPINION OF THE COURT

1. LOTTERIES—TICKETS—IRISH SWEEPSTAKES.

A contract between holders of Irish Sweepstakes tickets to share the proceeds of a winning ticket is judicially enforceable.

2. LOTTERIES—TICKETS—IRISH SWEEPSTAKES—CONTRACTS—PUBLIC POLICY.

Public policy of this state does not preclude a plaintiff from attempting to enforce his contractual claim that should either of two Irish Sweepstakes tickets, which were given to him and defendant as consideration for selling 20 lottery tickets, win any prize, the prize would be split equally between the two of them.

3. LOTTERIES—TICKETS—IRISH SWEEPSTAKES—CRIMINAL LAW.

No statute or rule of law of Michigan prohibits the holder of a winning Irish Sweepstakes ticket from receiving and retaining proceeds voluntarily paid by the lottery without legal action.

4. LOTTERIES—TICKETS—IRISH SWEEPSTAKES—CONTRACTS—CONSIDERA-TION—PUBLIC POLICY.

Because receipt and retention of Irish Sweepstakes winnings voluntarily paid by the promoter violates no Irish or Michigan statute or rule of law, a promise to share amounts so received constitutes legal consideration; a contract based on the exchange of legal consideration is a legal contract and its enforcement does not violate public policy.

DISSENTING OPINION

M. S. COLEMAN, J.

5. LOTTERIES—TICKETS—SALE—IRISH SWEEPSTAKES.

*Selling Irish Sweepstakes tickets is forbidden by statute (MCLA 750.372, 750.373).*

6. CONTRACTS—ENFORCEMENT—ILLEGAL ACTIVITY.

   *The courts should not be available to enforce an agreement to share proceeds of illegal activity.*

7. CONTRACTS—ILLEGAL SCHEMES.

   *Beneficiaries of illegal schemes should not be heard to complain that they did not receive their contemplated rewards.*

8. CONTRACTS—ILLEGAL CONTRACTS—CONSIDERATION—PUBLIC POLICY.

   *A party should not be permitted to enforce a promise which he has obtained by an illegal act.*

9. COURTS—PUBLIC POLICY.

   *Courts should not grant relief to violators of the law who seek to benefit as a result of their own violation but should leave the parties where they have placed themselves.*

10. LOTTERIES—STATUTES—PUBLIC POLICY.

    *The Legislature authorized only one type of lottery, a lottery run by the State of Michigan; all other lotteries remain illegal, and public policy is against them (MCLA 432.1 et seq.).*

11. LOTTERIES—IRISH SWEEPSTAKES—TICKETS—CONTRACTS.

    *The courts of Michigan should be unavailable to enforce an agreement to split the proceeds of a ticket obtained in remuneration for illegally selling Irish Sweepstakes tickets.*

*McCroskey, Libner, Van Leuven, Kortering, Cochrane & Brock,* for plaintiff.

*Scholten & Fant* (by *R. Neal Stanton* and *James P. Piper),* for defendant.

LEVIN, J. The question is whether a contract to share the proceeds of an Irish Sweepstakes ticket is judicially enforceable.

Miller claims that he and Radikopf jointly sold sweepstakes tickets. For each 20 sold, they received 2 tickets as compensation. Although each would put his name on one of the tickets, Miller

claims they agreed that the tickets were jointly owned and all winnings would be divided equally.

A ticket bearing Radikopf's name won and yielded in excess of $487,000. After Radikopf refused to surrender any of the proceeds, Miller commenced this action.

The trial court, stating that the alleged agreement was "spawned in violation of statute", granted Radikopf a summary judgment.

The Court of Appeals, referring to § 372 of the Penal Code[1] which prohibits the "set[ting] up or promot[ion of a] lottery", affirmed:

"It is true that receiving a lottery award voluntarily paid, is not prohibited. *People v Watson,* 75 Mich 582; 42 NW 1005 (1889). The general policy of this state against the holding of lotteries, MCLA 750.372 *et seq.;* MSA 28.604 *et seq.,* would be seriously compromised, however, if lottery winners were allowed to successfully bring suit for their prizes. Although the Court will not interfere where a lottery prize is voluntarily given the winner, public policy demands that courts not give support to the maintenance of lotteries in this state by allowing prize winners judicial process to collect their winnings." *Miller v Radikopf,* 51 Mich App 393, 395; 214 NW2d 897 (1974).

This is not, however, an action to collect prize winnings from a lottery promoter.

The narrow question to be decided is whether a contractual claim to a share of money legally paid by the Irish Sweepstakes and legally possessed by the defendant may be enforced.

We would hold that the public policy of this state does not preclude Miller from attempting to enforce his claim and, accordingly, would reverse and remand for trial.

---

[1] MCLA 750.372, *et seq.;* MSA 28.604, *et seq.*

It is a crime to "set up or promote" a lottery in this state.[2] It is similarly a crime for a person to "sell", "offer for sale", or "have in his possession with intent to sell or offer for sale" lottery tickets.[3]

However, it does not appear that Irish law prohibits the payment of money to holders of winning sweepstakes tickets. Nor does any statute or rule of law of this state prohibit the holder of a winning ticket from receiving and retaining proceeds paid voluntarily by a lottery without legal action.[4]

There being no statute barring enforcement of the claim asserted in this case, the question whether its enforcement would be in accord with public policy is for judicial decision.

There were several contracts preceding the contract sued upon. Miller and Radikopf agreed to sell sweepstakes tickets and to accept as consideration "free" tickets. Each ticket so received by them was a separate contract binding the lottery promoters to pay the holder of a winning ticket.

As neither Miller nor Radikopf is presently attempting to enforce the antecedent contracts, their possible illegality and attendant public policy ramifications need not concern us. Whatever their legality, those contractual obligations were fulfilled. A different question would be presented if Miller or Radikopf sought by legal action to collect either their compensation for selling tickets or lottery winnings directly from the promoters of the sweepstakes.

Miller in this action seeks to enforce the agreement he claims was made by him and Radikopf "that should either of the tickets win any prize, the prize would be split equally between the two of

---

[2] MCLA 750.372; MSA 28.604.

[3] MCLA 750.373; MSA 28.605.

[4] *See People v Watson*, 75 Mich 582, 586; 42 NW 1005 (1889); 38 Am Jur 2d, Gambling, § 59, p 154.

them". The consideration exchanged by each was a promise to the other to pay one-half of any proceeds won on tickets held in his name. Since receipt and retention of sweepstakes winnings voluntarily paid by the Irish promoter violates no Irish or Michigan statute or rule of law, a promise to share amounts so received constitutes legal consideration. A contract based on the exchange of legal consideration is a legal contract and its enforcement does not violate public policy.

Agreements to share possible proceeds from Irish Sweepstakes tickets are not an "essential part" of the sale and distribution of those tickets.[5] The continued success of the Irish Sweepstakes in this state is in no way dependent on the enforceability of agreements to share winnings. Miller's and Radikopf's collateral agreement to divide their prospective winnings was not an essential part of their sale and distribution of those tickets. Nor was their agreement dependent on illegal conduct in the acquisition of the lottery tickets; they might have acquired the tickets in a manner free of any suggestion of illegality and then entered into an agreement to share proceeds.

However this case is decided, the courts of this state will continue to refuse to entertain actions seeking an accounting of proceeds obtained from illegal enterprises such as the illegal sale of narcotics and bank robberies. Additionally, enforcement or an accounting will be denied, without regard to whether the proceeds sought to be divided have been legally obtained, if the consideration offered is illegal.

---

[5] In *Kukla v Perry,* 361 Mich 311, 324–325; 105 NW2d 176 (1960), the illegal aspect of the contractual relationship was an "essential part" of the agreement sought to be enforced.

*See, generally,* 6A Corbin on Contracts, part 8, ch 90, § 1529, pp 784–794.

Judicial nonenforcement of agreements deemed against public policy is considered a deterrent for those who might otherwise become involved in such transactions. While nonenforcement of Miller's claim might tend to discourage people from agreeing to split their legal winnings, nonenforcement would not tend to discourage people from buying or selling Irish Sweepstakes tickets. Both Miller and Radikopf have been compensated for selling the tickets and Radikopf has received the winnings as the holder of a particular ticket. No interest of the state would be furthered by nonenforcement of Miller's claim that he is the owner of one-half of those legal winnings.

It is consonant with the public policy of this state to encourage performance of legal contracts and to foster the just resolution of disputes. Nonenforcement of the agreement claimed by Miller would not tend to discourage the sale of Irish Sweepstakes tickets. It could reward, without any corresponding benefit, promissory default. We conclude that public policy would not be offended by enforcement of the claimed agreement.[6]

---

[6] The New York Court of Appeals in *Intercontinental Hotels Corp v Golden,* 15 NY2d 9, 14–15; 203 NE2d 210, 212–213; 254 NYS2d 527, 530–531 (1964), declined to determine public policy "by mere reference to the laws" of New York: "Strong public policy is found in prevailing social and moral attitudes of the community".

In holding enforceable in New York a gambling debt incurred in Puerto Rico where gambling was legal and judicially enforceable, the Court was motivated in part by "the changing attitudes of the People of the State of New York".

"The legalization of pari-mutuel betting and the operation of bingo games, as well as a strong movement for legalized off-track betting, indicate that the New York public does not consider authorized gambling a violation of 'some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal.' *(Loucks v Standard Oil Co* [224 NY 99, 111; 120 NE 198, 202 (1918)]).

"The trend in New York State demonstrates an acceptance of *licensed* gambling transactions as a morally acceptable activity, not objectionable under the prevailing standards of lawful and approved social conduct in a community. Our newspapers quote the odds on

We would reverse and remand for trial with costs to abide the event.

T. G. Kavanagh, C. J., and Swainson and Williams, JJ., concurred with Levin, J.

M. S. Coleman, J. *(to affirm)*. Through no moral recoil or illusion of piety, but as a matter of law, I am compelled to dissent from my colleagues' decision. It is true that the Irish Sweepstakes lottery is well operated and legal at its source. It is also true that it is illegal to sell the tickets in Michigan.

The statement of the controlling question by the majority is not as I see it. To me, it is whether a contract to share remuneration for an illegal act is judicially enforceable.

In December 1970 plaintiff and defendant began on a regular basis to participate in the sale of Irish Sweepstakes tickets. For every 20 tickets they sold, they received two free tickets. Each would place his name upon one. Plaintiff alleges— and defendant denies—an oral agreement between them that the free tickets were to be jointly owned

horse races, football games, basketball games and print the names of the winners of the Irish Sweepstakes and the New Hampshire lottery. Informed public sentiment in New York is only against unlicensed gambling, which is unsupervised, unregulated by law and which affords no protection to customers and no assurance of fairness or honesty in the operation of the gambling devices." (Emphasis by the Court.)

The Court further noted that public policy would not be furthered by allowing the defendant to manipulate "public policy" to his advantage: "[I]njustice would result if citizens of this State were allowed to retain the benefits of the winnings in a State where such gambling is legal, but to renege if they were losers."

*See, generally, Caribe Hilton Hotel v Toland,* 63 NJ 301; 307 A2d 85 (1973); Comment, *Public Policy and Conflict of Laws—Foreign Gambling Debts Collectible in New Jersey,* 27 Rutgers L Rev 327 (1974); Note, 33 Fordham L Rev 493, 497 (1963); Comment, *Conflicts— Enforceability of Foreign Gambling Contracts,* 22 U of Miami L Rev 853, 855, 860 (1968).

and that all prizes won by either would be divided equally. In June 1972 defendant, a super prize winner, won approximately $487,000. Plaintiff requests that a constructive trust be impressed upon half that amount. The lower court found the alleged contract illegal and granted defendant summary judgment.

I also would affirm.

## I.

Plaintiff submits that there is no law against the ownership of an Irish Sweepstakes ticket. He admits—and correctly so—that MCLA 750.372; MSA 28.604 and MCLA 750.373; MSA 28.605 forbid the setting up, promoting and selling of lottery tickets. However, he finds those statutes of little consequence. He bases his claim upon his one-half interest in the winning ticket. He requests this Court to impose a constructive trust upon half the winnings paid to the defendant.

Unlike the plaintiff, I do not find the statutes insignificant. They make unlawful the activity engaged in by these parties and enunciate state policy. When an agreement to share concerns the proceeds of illegal activity, the Court should not be available to enforce the agreement.

The Court in *Dettloff v Hammond, Standish & Co,* 195 Mich 117, 136; 161 NW 949 (1917), said:

"A contract is void if it contemplates acts that are illegal or contrary to public policy. *Drake v Lauer,* 182 N.Y. 533 [75 NE 1129 (1905)] ([aff'g] 93 App. Div. 86, 75 N.E. 1129). A contract which in its execution contravenes the policy and spirit of a statute is equally void as if made against its positive provisions. *Hunt v Knickerbacker,* 5 Johns. (N.Y.) 327 [1810]; *Wetmore v Brien,* 3 Head (40 Tenn.), 723 [1859]."

The Court of Appeals was correct when it stated that beneficiaries of illegal schemes should not be heard to complain that they did not receive their contemplated rewards. Here the plaintiff illegally sold Irish Sweepstakes tickets. He cannot be heard to complain that the consideration he sought from his illegal activities failed.

Plaintiff relies strongly upon *Manning v Bishop of Marquette,* 345 Mich 130; 76 NW2d 75 (1956). Mrs. Manning, after a bingo game, had stepped into a hole in the church parking lot. She sued the bishop. In allowing her suit, the Court observed that "even a rogue may have a cause of action", but the Court continued to say that it did not lend its aid "to the furtherance of an unlawful project", nor would the Court "decide, as between 2 scoundrels, who cheated whom the more". The Court noted that Mrs. Manning (neither a rogue nor a scoundrel so far as we know) had ceased her illegal activity and was on her way home when she was injured. It found that there was not a substantial causal relationship between Mrs. Manning's prior bingo game and her fall in the parking lot. The bingo game was a "remote link in the chain of causation".

Such is not the case here where the unlawful act was the source of the asserted "right". The prize was an integral part of the illegal sale.

I would follow *Kukla*,[1] agreeing that "public

[1] In *Kukla v Perry,* 361 Mich 311, 324–325; 105 NW2d 176 (1960), the Court stated:

"In this situation, we have consistently held that where an illegal contract is involved, the court will not enforce it or grant relief thereunder, particularly where it is not the innocent party that is pleading to the court. See *Groves v. Jones,* [252 Mich 446; 233 NW 375 (1930)] *supra; Cook v. Wolverine Stockyards Co.,* 344 Mich 207 [73 NW2d 902 (1955)]; and cases cited therein. Our position may be best summarized by the following excerpt from *McNamara v. Gargett,* 68 Mich 454, 462 (13 Am St Rep 355) [36 NW 218 (1888)]:

"'It is said, however, that Gargett received 25 bushels of oats, and

policy will not permit a party to enforce a promise which he has obtained by an illegal act". Like the *Cook* court,[2] I would "leave the parties where they have placed themselves" and hold that neither law nor equity will grant relief to violators of the law who seek to benefit as a result of their own violation.

## II.

Plaintiff also contends that the Lottery Act, 1972 PA 239; MCLA 432.1 *et seq.;* MSA 18.969(1) *et seq.* establishing a state operated lottery evinces a public policy in favor of lotteries.

I disagree. Section 37 of that act, MCLA 432.37; MSA 18.969(37), provides:

"Any other law providing any penalty or disability for the sale of lottery tickets or any acts done in connection with a lottery shall not apply to the sale of tickets or shares performed pursuant to this act."

ought not to be permitted to complain, as there is not a total failure of consideration. But the trouble is, the whole contract is tainted and avoided by the part of the consideration which is illegal. If any part of a consideration is illegal, the whole consideration is void, because *public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise, although he may have connected with the act or promise another which is legal.* 1 Parsons, Contracts, p 457; *Snyder v Willey,* 33 Mich 483, 496 [1876].' " (Emphasis added.)

[2] In *Cook v Wolverine Stockyards Co,* 344 Mich 207, 209; 73 NW2d 902 (1955), the Court said:

"The trial court held that an illegal contract, against public policy, had been pleaded and that under such circumstances courts will not enforce it or grant relief thereunder but leave the parties where they have placed themselves. In this the court was correct. *Richardson v. Buhl,* 77 Mich 632 (6 LRA 457) [43 NW 1102 (1889)]; *Cashin v. Pliter,* 168 Mich 386 (Ann Cas 1913C, 697) [134 NW 482 (1912)]; *Mulliken v. Naph-Sol Refining Co.,* 302 Mich 410 [4 NW2d 707 (1942)]; *Day v. Chamberlain,* 223 Mich 278 [193 NW 824 (1923)]; *Dettloff v. Hammond, Standish & Co.,* 195 Mich 117 (14 NCCA 901) [161 NW 885 (1917)]; *Turner v. Schmidt Brewing Co.,* 278 Mich 464 [270 NW 750 (1936)]."

The Legislature authorized only one type of lottery: a lottery run by the State of Michigan. All other lotteries remain illegal.

The Court in *Lieberthal v Glen Falls Indemnity Co of Glen Falls New York*, 316 Mich 37, 40; 24 NW2d 547 (1946), unequivocally said:

"Public policy of a State is fixed by its Constitution, its statutory law, and the decisions of its courts; and when the legislature enacts a law within the limits of the Constitution, the enactment insofar as it bears upon the matter of public policy, is conclusive. See *In re McKee's Estate*, 71 N.D. 545 (3 N.W. [2d] 797) [1942], wherein, quoting from an earlier case, it is said: 'Public policy is but the manifest will of the State. * * * And when the legislature has spoken and enacted a law embodying a certain principle, the policy is determined.' Michigan's public policy touching the phase of the law under consideration has been definitely fixed by statute."

Likewise, Michigan's public policy with respect to lotteries has been fixed by statute and that policy against lotteries other than those conducted by the state has been recently reaffirmed with the enactment of the Lottery Act of 1972.

Plaintiff presents several public policy arguments[3] with which we are sympathetic. Nevertheless, these arguments are more appropriately addressed to the Legislature rather than to this Court.

We do not sit to pass judgment on the sagacity of the Legislature. The statutes have been promulgated and public policy thereby established. I re-

[3] Plaintiff argues that the Irish Sweepstakes is one of the most historically acceptable lotteries in the world; that it is run legitimately in the open and its profits are to benefit people; that neither racketeers nor organized crime are involved; and since we encourage residents of other states to purchase our lottery tickets, what is wrong with one of our residents invoking our courts to aid in the collection from an out-of-state lottery?

spectfully acknowledge the legislative authority to establish such policy. To hold, in the face of the lottery statutes, that public policy dictates the relief sought by plaintiff would be to usurp that authority. I would not superimpose our judgment upon that of the Legislature.

If his story is true, I sympathize with plaintiff, but believe that the possible damage to the state of the law outweighs any inclination to bend it to accommodate either an individual or my personal inclinations.

If the Legislature wishes to recognize the Irish Sweepstakes as a lawful lottery, it may do so. Until then, the courts of this state should be unavailable to enforce an agreement to divide the proceeds of a ticket obtained in remuneration for illegally selling Irish Sweepstakes tickets.

The Court of Appeals is affirmed.

J. W. FITZGERALD, J., and the late Justice T. M. KAVANAGH took no part in the decision of this case.