**Steven ANNAS, Peter Deangelo and Douglas Carreri, Appellants,**

**v.**

**David W. ALLARD, Trustee, Appellee.**

No. 01–71417.

Bankruptcy No. 99–74903–SWR.

United States District Court, E.D. Michigan, Southern Division.

Feb. 15, 2002.

Thomas J. Budzynski, Clinton Township, MI, for Peter Ackhoff.

Stuart A. Gold, Gold & Lange, Tracy M. Clark, Gold, Lange, Southfield, MI, for Steven Annas, Peter de Angelo, and Douglas Carreri.

Rodney M. Glusac, Allard & Fish, Detroit, MI, for David W. Allard.

### OPINION AND ORDER AFFIRMING THE BANKRUPTCY COURT DECISION

ROBERTS, District Judge.

## I. INTRODUCTION

This bankruptcy matter is before the Court on Defendants' Steven Annas, Peter DeAngelo and Douglas Carreri ("Appellants") appeal from the Bankruptcy Court's order granting Trustee's motion for summary judgment and denying Debtor's and Appellants' motions for summary judgment. Trustee filed a complaint against the Debtor, Peter Ackhoff ("Debtor") and those who are the Appellants here, seeking to avoid the post-petition transfer of a Cadillac Escalade and to recover either the automobile, as property of the estate, or the proceeds from the unauthorized sale. The Trustee filed a summary judgment motion which the Bankruptcy Court granted. The effect was to (1) avoid the post-petition transfer of the automobile, (2) direct defendant-Annas to turn over the automobile and its title to the Trustee for sale, and (3) hold Debtor and Defendants jointly and severally liable to the Trustee for the difference between the value of the automobile at the time of the sale and the amount received therefrom, plus interest and costs.

This Court finds as a matter of law that Appellants did not have a property interest in the automobile and that they had no more than a contractual claim against Debtor for their one-quarter interests in the Cadillac. Thus, the Bankruptcy Court correctly held that, at most, Appellants had unsecured claims against the bankruptcy estate. The Court, therefore, affirms the decision of the Bankruptcy Court granting Trustee's motion for summary judgment.

## II. BACKGROUND

### A. STIPULATED FACTS

On September 3, 1999, Debtor participated in a golf tournament located at Chandler Park Golf Course and sponsored by "The Grind," a bar located in Detroit, Michigan. Appellants were the other members of Debtor's foursome at the tournament. Prior to commencing play, Debtor and Appellants orally agreed that if any one of them made a hole-in-one and won a prize they would equally divide the value of the prize. On the 8th hole Debtor had a hole-in-one. The prize for a hole-in-one on the 8th hole was a new 2000 Cadillac Escalade ("Cadillac"). Debtor executed a Verification Affidavit of Hole–in–One Winner that was required by the insurance company which paid for the Cadillac.

On September 22, 1999, Debtor filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code. David W. Allard

("Trustee") was appointed as the Chapter 7 Trustee of the Debtor's estate. As of the petition date, Debtor had not yet received the Cadillac; an investigation was pending by the insurance company retained by the tournament and liable under a policy to purchase the Cadillac from Don Massey Cadillac if a participant made a hole-in-one on the 8th hole. On his Schedule B, Debtor listed a "possible hole-in-one contest prize" as property of his estate, which he valued in the amount of $3,000. On his Schedule C, Debtor claimed the "possible hole-in-one contest prize" as exempt in the amount of $2,500 under Section 522(d)(5) of the Bankruptcy Code. At his first meeting of creditors (the "341 Meeting") on October 20, 1999, Debtor testified under oath that the "Possible hole-in-one contest prize" listed in Schedule B consisted of part of an interest in a car that he won by making a hole-in-one at the tournament. Debtor did not disclose the car's value at this meeting, or the fact that it was a Cadillac, despite the fact that he had been aware in April or May, 1999, that the prize was a Cadillac, when he had first seen a poster advertising the tournament. Debtor's counsel was made aware of the Cadillac at their initial meeting to prepare his bankruptcy schedules. At the 341 Meeting Debtor testified that the reason he listed the prize as "possible" on Schedules B and C was that there was some question as to whether the tournament's sponsor correctly followed procedures for insurance purposes. Debtor also testified that he believed he would only receive a 1/4 interest in the prize based on the oral agreement made by the members of the foursome. At the conclusion of the 341 Meeting Trustee advised Debtor that he would be investigating the asset due to its potential benefit to the estate.

On October 25, 1999, Debtor's counsel sent a letter to the Trustee providing a vague explanation of the circumstances surrounding the prize, but it did not reveal any new information concerning the make of the car, the status of the prize, or the nature of the oral agreement. Between November 15, 1999 and December 20, 1999, Trustee's counsel sent three letters to the Debtor's counsel demanding information about the prize. Debtor's counsel did not respond until December 22, 1999, revealing for the first time that the Debtor had taken possession of the Cadillac on November 24, 1999, that it had a M.S.R.P. ("Manufacturer's Suggested Retail Price") of $43,000, and that despite Trustee's many demands for information, it had been sold without notice to the Trustee, to Annas for $36,000 on the same day Debtor took possession.[1] Debtors sale of the Cadillac to Annas was not authorized by the Code or by order of the bankruptcy court.

Annas received a credit for his 1/4 share of the purchase price equal to $9,000 and gave Debtor a check for $28,000 which Debtor cashed at Annas' credit union.[2] On November 29, 1999, Debtor transferred $9,000 cash each to Carreri and DeAngelo. This transfer was not authorized by the Bankruptcy Code or the Bankruptcy Court. Debtor kept the remaining $10,000 and alleges that he immediately used a portion of it to purchase office equipment and machinery for his new business and spent a portion on living expenses. As of

1. Appellants allege that Annas was unaware of the debtor's bankruptcy proceedings at the time of the sale.

2. The Court takes note of the discrepancy in the stipulated facts concerning the amount Annas was credited. Had Annas been credited $9,000 toward the purchase price from Debtor, his check would have been for $27,000. Either Annas was only credited with $8,000 toward the purchase price, or Debtor only kept $9,000 after transferring $9,000 each to Carreri and DeAngelo.

March 30, 2000, Debtor stated that only $3,000 of his share of the purchase price remained. For the purposes of summary judgment only, the parties stipulated that the value of the Cadillac at the time of its transfer to Annas was $36,000.

### B. ADDITIONAL FACTS

On February 10, 2000, Trustee filed a complaint against Debtor and Appellants requesting relief under 11 U.S.C. § 549 to avoid the post-petition transfer of the Cadillac and under 11 U.S.C. § 542 to recover an amount equal to the Cadillac's M.S.R.P of $43,000. Appellants filed an answer to Trustee's complaint and a demand for a trial by jury, accompanied by a brief in support. Trustee objected to Appellants' request for a jury trial and on August 7, 2000, the Bankruptcy Court entered an order denying the request. The parties conducted discovery, entered stipulations of fact, then filed cross-motions for summary judgment. On February 22, 2001, the Bankruptcy Court issued an opinion granting Trustee's Motion and denying Debtor's and Defendants' Motions.

On March 29, 2001, the Bankruptcy Court entered a Judgment (1) avoiding the postpetition transfer of the Cadillac by the debtor to Annas pursuant to § 549(a); (2) directing Annas to turn over the Cadillac and its title to the Trustee for sale; and (3) holding the Debtor and Defendants jointly and severally liable to the Trustee for an amount equal to the difference between the stipulated value of the Cadillac, $36,000, and the amount received from its sale, with interests and costs.

Trustee's claims against the Debtor have been settled for $8, 500 payable over a 12 month period. The claims consisted of Trustee's objections to Debtor's exemption of interest in the Cadillac, Trustee's Complaint Requesting Revocation of Debtor's Discharge based on Debtor's alleged concealment of the Cadillac, and the March 29, 2001 Judgment avoiding the transfer of the Cadillac as it relates to Debtor.

On April 9, 2001, Appellants filed a Notice of Appeal.

## III. ISSUES ON APPEAL

The issue on this appeal is whether the Bankruptcy Court erred as a matter of law in concluding that Trustee met his burden of establishing that the Cadillac was property of the Debtor's estate as is required in order to recover estate property pursuant to § 549 of the Bankruptcy Code.[3]

## IV. ANALYSIS

### a. Standard of Review

 "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." FRBP Rule 8013. Thus, in a bankruptcy proceeding, the bankruptcy court is the finder of fact. *In re Isaacman*, 26 F.3d 629, 631 (6th Cir.1994)(citing *In re Caldwell*, 851 F.2d 852, 857 (6th Cir.1988)). Findings of fact are clearly erroneous in bankruptcy proceedings, as in other civil proceedings, when the reviewing court is "left with the definite and firm conviction that a mistake

---

**3.** There is also an issue concerning the Bankruptcy Court's denial of Appellants' request for a jury trial. However, in light of the Court's findings that the Bankruptcy Court did not err in granting Trustee's motion for summary judgment, the issue of Appellants' right to a trial by jury is moot.

has been committed." *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). On appeal the district court reviews de novo the bankruptcy court's conclusions of law. *In re Isaacman,* 26 F.3d 629, 631 (6th Cir.1994)(citing *In re Zick,* 931 F.2d 1124, 1126 (6th Cir.1991)).

### b. Summary Judgment

Under F.R.Civ.P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. Ag Trucking Inc.,* 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox,* 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.,* 48 F.3d 937 (6th Cir.1995); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472 (6th Cir.1989). Thus, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up." *Cox,* 53 F.3d at 149; *Street,* 886 F.2d at 1478. The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. F.R.Civ.P. 56(e); *Cox,* 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland,* 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party's position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder,* 57 F.3d at 488; *Tolton,* 48 F.3d at 941.

### c. The Cadillac

■ The Bankruptcy Court's finding that the Cadillac was property of the bankruptcy estate is the proper finding based on the bankruptcy code and case law. The bankruptcy code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "By including all legal interests without exception, Congress indicated its intention to include all legally recognizable interests although they may be contingent and not subject to possession until some future time." *Rau v. Ryerson (In re*

*Ryerson*), 739 F.2d 1423, 1425 (9th Cir. 1984) (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 175–76) *reprinted in* 1978 U.S.C.C.A.N. 5963, 6136. *See also In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993) (Section 541 includes "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative[.]"). The parties do not dispute that whatever interest Debtor had in the Cadillac is property of the bankruptcy estate. The issue is whether Appellants each had a one-quarter ownership interest in the Cadillac which should not have been included in the estate by the Trustee.

A bankruptcy debtor's property rights are created and defined by reference to state law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In the present case, Appellants argue that under *Miller v. Radikopf,* 394 Mich. 83, 228 N.W.2d 386 (1975), the agreement in this case is an enforceable contract. Further, Appellants argue that under *Miller* they are entitled to assert their ownership interests in the Cadillac in court. Thus, Appellants contend, under Michigan law they can each claim an ownership interest in one-quarter of the Cadillac pursuant to their valid oral agreement. Appellants' argument is unavailing.

In *Miller,* two individuals were involved in selling Irish Sweepstakes tickets. 394 Mich. at 85, 228 N.W.2d 386. For every twenty tickets sold they received two tickets as compensation. *Id.* Although each ticket had only one of their names on it, Miller alleged they had made an oral agreement that the tickets were jointly owned and that they would share any winnings equally. 394 Mich. at 85–86, 228 N.W.2d 386. The trial court, in granting

Radikopf summary judgment, held that the agreement violated a statute prohibiting the setting up or promotion of a lottery. 394 Mich. at 86, 228 N.W.2d 386. The Michigan Court of Appeals affirmed. *Id.* The Michigan Supreme Court reversed, holding that enforcement of their agreement would not violate public policy because state law did not prohibit the holder of a winning ticket from receiving proceeds from an out-of-state lottery.[4] *Id.* Further, the Court found that a mutual promise to share winnings constituted legal consideration. 394 Mich. at 88, 228 N.W.2d 386. The Court therefore remanded the case for trial to allow Miller to attempt to enforce the agreement. 394 Mich. at 90, 228 N.W.2d 386.

Appellants contend that under *Miller* they can assert their ownership interests in the Cadillac based on the oral agreement, 394 Mich. at 89, 228 N.W.2d 386. Appellants rely upon the Court's finding that "[n]o interest of the state would be furthered by nonenforcement of Miller's claim that he is the owner of one-half of those legal winnings" in support of this contention. *Id.* Under Appellants' view of Michigan law then, the agreement gave rise to an ownership interest in the Cadillac and not merely a contractual claim against the Debtor for their share of the Cadillac's value. The Court's holding in *Miller,* however, does not support Appellants' broad conclusion. First, the Court in *Miller* did not hold that the agreement between Miller and Radikopf was a valid and enforceable contract; it remanded that issue for trial. 394 Mich. at 86, 228 N.W.2d 386. Second, because the Court held that public policy did not prevent the enforcement of Miller and Radikopf's agreement, it never directly addressed the

---

4. The Court acknowledged that the question would be different if either Miller or Radikopf had brought this action to collect their proceeds from the promoters of the Irish lottery. 394 Mich. at 87, 228 N.W.2d 386.

issue of whether Miller's had a property interest in the ticket. Thus, even assuming that the agreement in the present case is a valid contract, the Court's decision in *Miller* does not support Appellants' conclusion that they each have a one-quarter ownership interest in the Cadillac.

The Bankruptcy Court distinguished the present case from *Miller* based on the fact that the Cadillac was awarded solely to the Debtor and that there was no indication that the contest holders recognized anyone but the Debtor as the winner. Therefore, the Bankruptcy Court found that Michigan law did not create separate property interests in the Appellants' shares of the Cadillac. While neither of these factors was controlling in *Miller*,[5] the Bankruptcy Court's finding that Appellants' reliance on *Miller* was misplaced is nevertheless correct.

The Bankruptcy Court also relied on *Sirek v. Dalton (In re Dalton)*, 146 B.R. 460 (Bankr.D.Ariz.1992) in finding that Appellants' did not have a property interest in the Cadillac. In *Dalton*, debtor and her mother purchased a ticket for the Arizona lottery together and agreed that any winnings would be split equally. 146 B.R. at 461. The agreement was not put in writing, nor was it approved by the Arizona lottery commission. *Id.* Debtor subsequently became a holder of a portion of the winning ticket and was entitled to receive a 1/20 interest in the grand prize, payable in annual installments over twenty years. *Id.* The lottery rules did not recognize claims of any person other than the holder and the holder's interest was not transferable. *Id.*

The trustee in bankruptcy subsequently filed a complaint to recover all of debtor's

interest in the lottery proceeds as property of the bankruptcy estate. 146 B.R. at 461. On trustee's motion for summary judgment, the bankruptcy court found that it was clear that all of the debtor's proceeds were part of the estate. 146 B.R. at 462. Debtor argued that her mother's interest should not be considered part of the bankruptcy estate. *Id.* The bankruptcy court noted that although the Arizona lottery did not recognize debtor's mother as the winner and that under the statute the prize was not assignable, there was an exception where proceeds could be paid to another person pursuant to an "appropriate judicial order".[6] *Id.* Therefore, the bankruptcy court had to consider whether bankruptcy litigation could result in such an order. 146 B.R. at 463.

The Bankruptcy Court looked at case law from another state interpreting a similar provision, and held that the exception for "appropriate judicial orders" would be strictly construed so that it could not be used to voluntarily assign interests in prizes to third parties. *Id.* Otherwise, the court held, the exception would swallow the statute's general prohibition of assignment. *Id.* Thus, the court held that the bankruptcy proceeding did not qualify under the "appropriate judicial orders" exception to the non-assignability provision. *Id.* The bankruptcy court also found significant that the lottery commission, an agency with expertise in interpreting the statute, had also refused the claim of debtor's mother. *Id.* The bankruptcy court, therefore, granted the trustee's motion for summary judgment and required debtor to turn over the entire proceeds received from the lottery. *Id.*

---

**5.** In fact, the tickets in *Miller* each had only one name listed as the holder and the facts do not indicate whom the Irish lottery recognized as the winner.

**6.** A.R.S. § 5–513(A)(1)

Similarly, the Bankruptcy Court in the present case found it significant that the promoters of the Cadillac contest, like the lottery commission in *Dalton,* did not recognize Appellants as winners of the Cadillac. *Dalton* may be distinguishable on the ground that the lottery had an explicit anti-assignment provision. While Michigan has a similar lottery statute,[7] it appears to be limited to lotteries conducted by the state. Further, outside of the state lottery context, there does not appear to be a general rule against assigning prizes to third parties. See *Bays v. U.S. Camera Publishing Corp.,* 18 Mich.App. 385, 171 N.W.2d 232 (1969) (holding magazine could not impose restriction on assignment and transfer of prize not set forth in contest rules). Thus, the holding in *Dalton* would not seem to preclude Debtor in this case from assigning a portion of his interest in the Cadillac to Appellants.

The case that provides the most guidance is *Medrano Diaz v. Vazquez–Botet,* 204 B.R. 842 (D.Puerto Rico1996) *aff'd by Diaz v. Hernandez,* 121 F.3d 695 (1st Cir.1997)(Table). In *Medrano Diaz* debtor and his wife, just prior to getting married, had purchased a lottery ticket which returned a $3.5 million prize, 204 B.R. at 843. They divorced approximately one year later. *Id.* While proceedings were still pending to determine ownership of the lottery proceeds, debtor filed a bankruptcy petition. 204 B.R. at 843–44. He claimed an exclusive right to the prize, while his ex-wife claimed a 50 percent separate ownership interest in the prize. 204 B.R. at 844. Debtor argued that his ex-wife did not have a separate ownership interest in the prize and that she failed to timely file a proof of her claim in debtor's bankruptcy. *Id.*

The district court upheld the bankruptcy court's determination that the parties had purchased the lottery ticket together and that they had agreed to share it in equal parts. 204 B.R. at 846–848. It did so based on evidence that after they won they sought advice from an attorney on how to formally legalize their intention of dividing the ticket in half, to be owned separately; that Debtor had language in his will stating that their interests in the prize were their separate property; and, that after they were married they had continued to show public manifestations of their separate ownership interests of the lottery prize. *Id.* The Court found that the bankruptcy court's findings of fact on this issue were not clearly erroneous. 204 B.R. at 849.

The second important finding of the *Medrano Diaz* court was that under Puerto Rico law a lottery ticket may have multiple owners who can seek to establish their individual claims in court. 204 B.R. at 848–849. Therefore, the court found that the wife's 1/2 interest in the proceeds of the lottery was not property of the bankruptcy estate under 11 U.S.C. § 541. 204 B.R. at 849.

The Bankruptcy Court in this case distinguished *Medrano Diaz* because it found there were no facts in the present case evidencing an intent by the parties to create separate ownership interests in the Cadillac. Further, the Bankruptcy Court found that although the agreement might be enforceable, it did not create a separate property interest in the Cadillac under Michigan law.

Appellants argue that it was unnecessary for them to bring in evidence of the type offered in *Medrano Diaz* to show an intent to create separate ownership interests because the parties had expressly stipulated that Debtor and Appellants had

7. M.C.L.A. 432.25

entered into an agreement to share any prizes won at the tournament. *Appellants' Br.*, p. 7 fn 4. Further, Appellants argue that their conduct and Debtor's conduct illustrates their understanding that they all had equal ownership interests in the Cadillac. First, Appellants and Debtor paid equal shares of the licensing costs and sale taxes, totaling $2,769 each, and $3,655 each in capital gain taxes, after Debtor took possession of the Cadillac. Second, Appellants argue that Debtor testified at the 341 meeting that he believed he was only entitled to a 1/4 interest in the car, and that Debtor listed only his one-quarter interest in the car as exempt on his bankruptcy schedules B & C. *Appellants' Supp. Brief*, p. 4.

In response, Trustee argues that the agreement was to divide the *value* of any prizes won at the tournament, not ownership. *Appellee's Br.*, p. 6. Trustee argues that the stipulated facts show that after the petition date Debtor sold the car to Appellant Annas and that Annas then transferred the title from the Debtor to himself. *Id.* Further, Trustee notes that only Annas was given a Bill of Sale from the Debtor. *Appellee's Br.*, p. 7.

Based on the facts in the record and the law presented by the parties, the Bankruptcy Court properly found that the entire interest in the Cadillac was property of the bankruptcy estate. First, Appellants' argument that their conduct and that of Debtor illustrates their intent that each had equal ownership interests in the Cadillac is unavailing. The stipulated facts indicate that Debtor liquidated

his individual interest in the vehicle immediately upon possession. The parties stipulated to the fact that Debtor sold Appellant–Annas the car for $36,000 on November 24, 1999, the same day that Debtor took possession. Annas received a "credit" for his one-quarter interest in the car equal to $9,000, so his check to Debtor was for $28,000.[8] Debtor then transferred $9,000 each to Appellants Carreri and DeAngelo. Even taking into account the $6,424 each member of the golf foursome paid in taxes and licensing, they each received a net gain of at least $2,576 from the prize and this sale.[9] Further, Debtor's statement to creditors at the 341 meeting that he believed he was only entitled to a one-quarter interest in the prize is meaningless. Debtor knew that he would likely be unable to keep the Cadillac once he filed his bankruptcy petition. Thus, instead of turning it over to creditors Debtor may have preferred to give it to other members of the foursome. Because Debtor was only claiming a one-quarter interest in the Cadillac he was able to claim it as an exemption under 11 U.S.C. § 522(d)(5). Had Debtor claimed the entire Cadillac he would not have been entitled to this exemption.[10] Thus, contrary to what Appellants argue, their conduct and that of Debtor illustrates an intent to equally divide the value of the Cadillac rather than an ownership interest. This falls well short of the type of evidence the court in *Medrano Diaz* found sufficient to conclude that the parties had entered into an

---

8. This discrepancy is addressed in footnote 2, *supra.*

9. Annas further benefitted by "paying" only $36,000 for a car with a M.S.R.P. of $43,000.

10. Debtor may have been able to claim up to $8,300 under this exemption, assuming that he had not attempted to exempt other property under this same provision. However, the point is that Debtor could not have used this exemption to shield the entire value of the Cadillac, so claiming a one-quarter interest was self-serving and not necessarily indicative of how be viewed his ownership interest in the Cadillac.

agreement to share the prize as joint property.

Second, there is no indication from the case law that Appellants obtained an ownership interest in the Cadillac by virtue of their oral agreement to share any prizes won at the tournament. As discussed above, none of the three main cases cited by the parties—*Miller, Dalton,* or *Medrano Diaz*—supports Appellants' argument that they have a property interest in the Cadillac. Appellants cite several state cases for the rule that oral contracts are to be construed to effectuate the intent of the parties at the time of execution. Appellants would have the Court take their and Debtor's conduct into account in conjunction with the agreement, and find that the intent of the parties was to share ownership of the Cadillac. As discussed above, however, the conduct of Debtor and Appellants is more indicative of their intent to share the value of the car rather than its ownership. Thus, even if the Court was convinced that the intent of the parties alone is sufficient to create an ownership interest, under the facts of this case such a finding in not warranted.

Third, Appellants' argument that their interests in the Cadillac were fixed at the time they entered the agreement does not advance their ownership claims. The Trustee argued that Debtor's receipt of the Cadillac was a condition precedent to his duty to perform under the agreement. Thus, since Debtor did not receive the Cadillac until after he filed his bankruptcy petition, any interests Appellants may have had in the Cadillac did not vest until after the filing. Appellants argue that because they knew what the prize for a hole-in-one was when they made the agreement, and because there is nothing in the record that they or the Debtor intended to delay the vesting of their interests, the agreement was fully performed and their

ownership interests were fixed prior to the petition date.

Appellants' argument is undermined by the fact that the case it cites in support, *Lingham v. Eggleston,* 27 Mich. 324 (1873), dealt with the sale of goods where it is clear that at some point title must pass from seller to buyer. In the present case, however, there is no indication from the cases cited by the parties, nor by the Court's own research, that the agreement gave rise to any type of ownership interest in the Cadillac.

One case that is instructive on the issue of unperformed obligations is *In re Columbia Gas System, Inc.,* 50 F.3d 233 (3rd Cir.1995). In *Columbia Gas,* the Court addressed the issue of what is considered an "executory" contract under 11 U.S.C. § 365. Under section 365, "Executory Contracts and Unexpired Leases," the trustee in bankruptcy has the discretion to assume or reject any executory contract or unexpired lease of the debtor, subject to the court's approval. After looking to other circuits and legislative history, the Court defined "executory contract" for the purposes of section 365 as:

> "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."

50 F.3d 233, 239

In the present case, it is clear that Appellants had fully performed because under the agreement their reciprocal promises to share the proceeds of any prizes won arguably constituted sufficient consideration. Debtor, on the other hand, could not perform until he gained possession of the Cadillac. Thus, under the court's definition in *Columbia Gas* the contract at issue was not executory because the time

for determining "whether there are unperformed obligations on both sides is when the bankruptcy petition is filed" [11] and at that point Appellants had fully performed. The court in *Columbia Gas* went on to state that,

> "[w]hen it is the nonbankrupt party who has substantially performed so that its failure to complete performance would not constitute a material breach excusing performance of the debtor, the nonbankrupt party is relegated to the position of a general creditor of the bankrupt estate."

50 F.3d 233, 239–240

Therefore Appellants, at most, have an unsecured claim against Debtor for their one-quarter interests in the Cadillac. As a result, Trustee was entitled to avoid the transfer of the Cadillac from Debtor to Annas and the payments of $9,000 made to Carreri and DeAngelo under 11 U.S.C. § 549(a) as unauthorized postpetition transactions.[12]

## V. CONCLUSION

For the above reasons, the Court AFFIRMS the Bankruptcy Court's decision granting the Trustee's motion for summary judgment.

**IT IS SO ORDERED.**

---

**11.** 50 F.3d 233, 240.

**12.** Section 549 "Postpetition transactions" states:

 (a) Except as provided in subsection (b) or (c) of this section [which are inapplicable here]; the trustee may avoid a transfer of property of the estate—--

(1) that occurs after the commencement of the case; and

(2) (A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court.

11 U.S.C. § 549.