CARIBE HILTON HOTEL, PLAINTIFF-APPELLANT, v.
MARVIN TOLAND, DEFENDANT-RESPONDENT.

Argued February 6, 1973—Decided June 26, 1973.

Mr. M. *Richard Scheer* argued the cause for appellant (*Messrs. Eichenbaum, Kantrowitz & Leff*, attorneys; *Mr. Louis J. Greenberg*, on the brief).

No brief filed or appearance on behalf of respondent.

The opinion of the Court was delivered by

MOUNTAIN, J. Plaintiff, Caribe Hilton Hotel of San Juan, Puerto Rico, brought suit in the Law Division against the defendant, Toland, a resident of New Jersey, to recover an indebtedness which the defendant admittedly contracted in the plaintiff's gambling rooms in San Juan. The parties stipulated that the underlying gambling transactions were legal under the laws of Puerto Rico but would have been illegal under the laws of New Jersey had they been entered upon here. The defendant originally purported to pay the indebtedness by delivering checks in San Juan drawn upon his New Jersey bank. Before the checks could clear, however, he stopped payment. Before the trial court, the defendant asserted as a defense that the gambling debts were unenforceable in New Jersey since to permit recovery would contravene the public policy of this State. The trial court relied upon *Flagg v. Baldwin*, 38 *N. J. Eq.* 219 (E. & A. 1884), *Minzesheimer v. Doolittle*, 60 *N. J. Eq.* 394 (E. & A.

1900), and *Schwartz v. Battifarano*, 2 *N. J.* 478, 483 (1949) and held, agreeing with defendant's argument, that as a matter of public policy New Jersey would not entertain a suit to enforce a gambling debt which would have been illegal if contracted in New Jersey. We granted the plaintiff's petition for certification before argument in the Appellate Division, 62 *N. J.* 185 (1972).

■ Puerto Rican law controls the question as to the legality of the contract. Whether we simply say that the legality of a contract is to be determined by the law of the place where the contract is made, *Staedler v. Staedler,* 6 *N. J.* 380, 389 (1951); *Colozzi v. Bevko, Inc.,* 17 *N. J.* 194, 202 (1955); *Hudson v. Hudson,* 36 *N. J.* 549, 555 (1962); *Louis Schlesinger Co. v. Kresge Foundation,* 312 *F. Supp.* 1011, 1028 (D. C. N. J. 1970), or whether we adopt the more modern formulation that rights and duties of contracting parties shall be determined by the law of the jurisdiction having the most significant relationship to the parties and to the transaction, *Restatement, Conflict of Laws* 2d § 188; *Kievit v. Loyal Protective Life Ins. Co.,* 34 *N. J.* 475, 492–493 (1961); *HIMC Investment Co. v. Siciliano,* 103 *N. J. Super.* 27, 34 (Law Div. 1968), the result in this case will be the same. The parties were physically present in Puerto Rico at the time of the transaction, the gambling debt arose there and indeed the defendant made a pretense of satisfying his obligation by delivering checks on the spot, albeit he later elected to stop payment. Counterpoised is the single fact that defendant is a resident and citizen of New Jersey. Clearly the contacts of greater significance are with Puerto Rico, which is also, of course, the jurisdiction where the contract was made.

Since it is stipulated that the claim is legal under Puerto Rican law, the issue is squarely presented as to whether our courts should, in the interest of supporting a supposed public policy, any longer refuse to entertain original suits for the recovery of gambling debts valid and recoverable by

the law of the jurisdiction in which they have been contracted. Or otherwise expressed, should New Jersey longer remain a privileged sanctuary for those who would play but will not pay? The cited cases above upon which the trial court properly relied, clearly hold that there should be no recovery. We have concluded that the question is ripe for review.

It would be fair to say that during the 19th and well into the 20th century the public policy of this State condemned gambling. By a comprehensive statute enacted February 8, 1797 (*Paterson, Laws,* 224) gaming in all forms was declared to be an indictable offense; contracts and security arrangements having their origin in any form of gambling were declared void; money paid by a loser to a winner might be recovered in an action in debt and if the loser failed to sue, a third person might do so and if successful retain one-half the recovery, the balance to pass to the State. The plaintiff in such an action might have the aid of a court of equity to compel discovery under oath. A very similar law was passed February 13 of the same year directed particularly to lotteries. (*Paterson, Laws,* 227). They were declared to be common and public nuisances and as such indictable.

This legislative condemnation received strong support from the courts. Judicial relief of any sort was consistently denied in cases where the fruits of gambling or wagering were involved, even though the gaming transactions had occurred in jurisdictions where they were perfectly legal. Thus in *Watson v. Murray,* 23 *N. J. Eq.* 257 (Chan. 1872) the complainant sued to dissolve a firm of which he was a partner and sought discovery and an accounting of profits from the other members of the partnership. It was shown that the firm had owned and operated lottery franchises in several states where such an operation was entirely legal. The fact that the firm's profits emanated from this tainted source was enough to move the Court of Chancery to deny all relief. Vice Chancellor Dodd said,

[a]ssuming that all the contracts and transactions involved . . .. occurred in states where they were tolerated by law, my opinion is that this court will not undertake to enforce or administer them. [23 *N. J. Eq.* at 260]

The court's strong convictions are also apparent from other language in the opinion.

I think they [gambling operations] are to be taken judicially, if not abstractly in ethics, as *mala in se;* bad in their nature, and bad in their results; notoriously prejudicial to the interests and morals of the public. Their enticing illusiveness is a fraud. [23 *N. J. Eq.* at 261]

In the leading case of *Flagg v. Baldwin,* 38 *N. J. Eq.* 219 (E. & A. 1884) the court refused to permit the foreclosure of a mortgage given to secure indebtedness which had arisen in connection with a kind of speculation in securities which the court found would have been in violation of our gambling laws had it taken place in New Jersey. It had in fact occurred in New York where it was admittedly legal. The court acknowledged that the highest tribunals in certain other states were accustomed to enforcing gambling contracts valid where made, though illegal under the law of the forum. These decisions were dismissed, however, with the laconic if nonetheless revealing comment that in those cases "there was no discussion of principle by the court." 38 *N. J. Eq.* at 225. Justice Magie, who was later to become Chief Justice and then Chancellor, speaking for a majority of our then highest court, did indeed enter upon such a discussion and concluded that

[o]ur law against gaming is of such a character, and is designed for the prevention of a vice, producing injury so widespread in its effect, the policy evinced thereby is of such public interest that comity does not require us to here enforce a contract which, by that law, is stigmatized as unlawful, and so prohibited. [38 *N. J. Eq.* at 227]

These statements may fairly be said to represent the then prevailing judicial point of view as to gambling.

Meanwhile the Constitution of 1844 had been adopted. It expressly forbade lotteries or the sale of lottery tickets within the State. Art. IV, § VII, par. 2. In 1897 this provision was extended to deny the right of the Legislature to authorize "pool-selling, book-making or gambling of any kind." Perhaps suggesting the trend of the future, this amendment of 1897 was adopted by a bare majority of the popular vote. 2 *New Jersey — A History* (Kull ed. 1930) 581. In 1939 a further constitutional amendment was adopted. Unlike the restrictive amendment of 1897, this amendment of 1939 was liberalizing. It permitted on-track pari-mutuel betting on horse races conducted at legalized race tracks. Pursuant to such authorization the Legislature adopted *L.* 1940, *c.* 17, now *N. J. S. A.* 5:5–22 *et seq.,* establishing a Racing Commission and setting forth the manner in which the pari-mutuel system of wagering was to be operated at race tracks. It should be noted, however, that the 1939 amendment authorized only this one form of wagering; it explicitly prohibited all other forms.

The Constitution of 1947, while generally continuing the ban on legislation authorizing gambling, did contain specific exceptions to this prohibition. It continued unchanged the authorization for pari-mutuel betting on horse races that had .been first permitted in 1939. It authorized "bona fide veterans, charitable, educational, religious or fraternal organizations, civic and service clubs, volunteer fire companies and first aid or rescue squads," subject to such restrictions and control as might be from time to time prescribed by the Legislature, to conduct the game of chance commonly known as bingo or lotto and to hold raffles. These authorizations have been legislatively implemented by the Bingo Licensing Law, *N. J. S. A.* 5:8–24 *et seq.,* and the Raffles Licensing Law, *N. J. S. A.* 5:8–50 *et seq.* Finally the 1947 Constitution permits the Legislature to authorize any kind of gambling that shall be approved by popular referendum. Such a referendum was submitted as to one form of gambling

and approved at the general election in 1969. This amendment, so approved, now appears as the final subsection of Art. IV, § VII, par. 2, which reads as follows:

It shall be lawful for the Legislature to authorize the conduct of State lotteries restricted to the selling of rights to participate therein and the awarding of prizes by drawings when the entire net proceeds of any such lottery shall be for State institutions, State aid for education.

The conduct of such lotteries is now controlled by the State Lottery Law, *N. J. S. A.* 5 :9–1 *et seq.*

▉ Other than the statutes mentioned above, which were enacted to implement specific constitutional authorizations, there has been only one other legislative change of immediate significance. In 1967 New York adopted a state lottery, and apparently in response thereto our Legislature amended the statutes forbidding possession of lottery slips, *N. J. S. A.* 2A :121–3 and 2A :170–18, to exclude those purchased in a state where the lottery was authorized. *L.* 1967, *c.* 88. See *Pineiro v. Nieves,* 108 *N. J. Super.* 51 (App. Div. 1969), certif. den. 55 *N. J.* 593 (1970). Otherwise our civil laws prohibiting gambling in general, *N. J. S. A.* 2A : 40–1 *et seq.,* and our criminal laws, *N. J. S. A.* 2A :112–1 *et seq.,* making unauthorized gambling a misdemeanor, carry the same sense and much the same wording that appeared in the early statutes of 1797. But can it longer be said that gambling is so offensive to the public policy of New Jersey as to justify our courts in continuing to deny relief to a suitor claiming the fruits of a gambling debt which has arisen in a jurisdiction which legally countenances the wagering transaction? We think not.

While New Jersey continues to take a strict view of those forms of gambling which are prohibited, the fact that wagering in various different ways is now authorized demonstrates that our public policy no longer can be said to condemn gambling *per se*. Rather our policy has become one of carefully regulating certain permitted forms of gambling while prohibiting all others entirely.

A very similar policy toward gambling prevails in Puerto Rico. As in New Jersey, a state lottery, bingo and on-track pari-mutuel betting on horse races are permitted subject to regulation. 15 *L. P. R. A.* §§ 111–128, 151–157, 181–197. Additionally certain enumerated games of chance are allowed, but only in licensed gambling rooms. 15 *L. P. R. A.* §§ 71–79. Certain other forms of gambling are strictly prohibited. 33 *L. P. R. A.* §§ 1211–1259. It certainly cannot be said that Puerto Rico exhibits a casual or careless stance toward gambling.[1] While providing that a person who sustains a gambling loss, where the game or wager was not prohibited, will be civilly liable, the applicable statute goes on to say that

[n]evertheless, the judicial authority may either not admit the claim when the sum is excessive, or may reduce the obligation by the amount it may exceed the customs of a good father of a family. [31 *L. P. R. A.* § 4774]

Puerto Rico has chosen to allow gambling in the form of roulette, dice and cards in licensed gambling rooms and New Jersey has not. Furthermore there is every indication that this State still maintains a strong public policy against gambling. Yet both jurisdictions are in accord in having adopted an overall general policy of legalizing certain specified forms of wagering and of permitting their operation under rather strict regulation. In this case, the differences in the particular laws that manifest this common policy should not be considered sufficient to lead a forum court to deny relief where a claim is based upon the divergent law of the other jurisdiction.

[I]t should take a very strong case to preclude recovery upon a foreign contract on the ground of supposed conflict with local morals or policy. It is hard to think of many transactions which have the stamp of approval of the law of some civilized state upon them which

---

[1] For a rather full description of the comprehensive nature of gambling regulations in Puerto Rico, see *United Hotels of Puerto Rico, Inc. v. Willig*, 89 *P. R. R.* 185 (1963).

reek so of immorality that to give a money judgment upon the claim will jeopardize the ethical standards of the forum. For one state of the Union to assume such an attitude with regard to a contract centered in another seems an intolerable, provincial affectation of virtue. [*Goodrich, Conflict of Laws* (*Scoles ed.* 1964) 198]

Nor do we discern any interest that New Jersey seeks to protect that will be impaired by our recognition and enforcement of this claim.

Quite recently the same issue that is here presented arose in New York. In *Intercontinental Hotels Corp. v. Golden*, 15 *N. Y.* 2d 9, 254 *N. Y. S.* 2d 527, 203 *N. E.* 2d 210 (1964) the Court of Appeals reversed the Appellate Division and reinstated the decision of the trial court which had allowed recovery of a gambling debt incurred in a licensed gambling establishment in Puerto Rico. The court examined the public policy of New York which it concluded was determinable not merely by reference to laws but also from a consideration of "prevailing social and moral attitudes of the community.", 254 N. Y. S. 2d at 203 *N. E.* 2d at 212–213. It noted the various forms of gambling that had been legalized and determined that the public policy of the state no longer found licensed gambling to be objectionable. See Note, 33 *Fordham L. Rev.* 493 (1965). We conclude that the public policy of New Jersey likewise constitutes no bar to the plaintiff in seeking to press its claim in this suit.

At the trial of the action the court should satisfy itself that the gambling debt was in all respects legally contracted — that plaintiff's gambling establishment was operating under a valid license at the time and that no laws, rules or regulations were offended. We also hold that the defendant is entitled to assert any and all defenses that might be available to him had the action been instituted in the Commonwealth of Puerto Rico.

The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB, Justices JACOBS, HALL, MOUNTAIN and SULLIVAN, and Judges CONFORD and LEWIS—7.

*For affirmance*—None.