**GULF COLLATERAL, INC., Plaintiff,**

v.

**L. H. MORGAN, Defendant.**

**No. CV376–4.**

United States District Court,
S. D. Georgia,
Dublin Division.

June 21, 1976.

James P. McLaughlin, Jr., Moore, McLaughlin & Smith, Macon, Ga., for plaintiff.

Will Ed Smith, Smith & Harrington, Eastman, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LAWRENCE, Chief Judge.

### I

Plaintiff as assignee has brought this diversity action against a Georgia citizen based on two checks given by the defendant in payment of gambling transactions which occurred at Las Vegas, Nevada in 1971.

Defendant has filed a motion for summary judgment on the ground that the gambling transaction involved is against the public policy of Georgia whose courts are not open to those suing on such obligations irrespective of whether the debt is valid under the law of the state where it was incurred.

The material facts are not in dispute. According to the uncontroverted affidavit of the defendant Morgan, he was "shooting craps at Caesar's Palace" and had gone in debt in purchasing chips for gambling. He had established "a line of credit". When the time came to render unto Caesar the things which be Caesar's, Mr. Morgan was $15,000 short. He gave the Palace a postdated check for that amount drawn on the Bank of Fitzgerald. Apparently he decided that he would try to recoup. Gambling is a dicey business. Defendant lost $2,000 more and gave another post-dated check in that amount. When he returned to Georgia, he withdrew money from his bank account with the result that the two checks were returned by the drawee because of insufficient funds.

In 1974 Caesar's Palace assigned the bad checks to the plaintiff, Gulf Collateral, Inc., which is a Texas corporation.[1] The plaintiff is not a holder in due course.

### II

In Nevada commercial gambling has been legalized and obligations created by aleatory transactions may be enforced in its courts. In Georgia it is a misdemeanor to play or bet money at any game played with dice. Ga.Code Ann. § 26–2702. Operation of a commercial gambling place is a crime. § 26–2703. The public policy of this State in respect to gaming is reflected in § 20–505. It declares that all gambling contracts are void (except negotiable instruments in the hands of holders in due course). Monies lost may be recovered by the loser within six months or thereafter by any other person for the joint use of himself and the county's educational fund. See *Tatham v. Freeman et al.*, 51 Ga.App. 477, 180 S.E. 871. "The policy of the law-making power of this State has been to frown consistently on gambling transactions of whatever character." *McLennan v. Whiddon*, 120 Ga. 666, 669, 48 S.E. 201, 202. Wagering contracts are against the policy of the law and are unenforceable. § 20–504. I cannot perceive that things have changed in this respect since 1857 when the Supreme Court of Georgia said: "If the Acts of the Legislature are to be referred to as evidence of what public policy is in such cases, there can be no doubt in this case. The great rule of public policy established by our Legislature is, that the winner shall not be protected in his unlawful gains. . . ." *Alford v. Burke*, 21 Ga. 46, 49–50.

---

1. Similar assignments have been made to Gulf Collateral, Inc. in other instances and it has brought suit thereon in Texas on gambling obligations of residents of that State. See *Gulf Collateral, Inc. v. Johnston* (Tex.Civ.App.), 496 S.W.2d 123; *Gulf Collateral, Inc. v. George* (Tex.Civ.App.), 466 S.W.2d 21. The latter decision involved a Caesar's Palace transaction. In each of these cases the Texas court held that recovery of the gambling debt was contrary to the public policy of Texas and unenforceable regardless of its legality in Nevada.

■ The laws of other states have no force in Georgia except on principles of comity and so long as their enforcement "is not contrary to the policy of this State". § 102–110(9); § 102–108. *National City Bank of Rome v. First National Bank of Birmingham,* 193 Ga. 477, 488, 19 S.E.2d 19; *Pratt v. Sloan,* 41 Ga.App. 150, 152, 152 S.E.2d 275; *Benton & Brother v. Singleton,* 114 Ga. 548, 40 S.E. 811. If the *lex loci* contravenes the public policy of Georgia or is immoral or violative of conscience, it will not be enforced in this State. *Eubanks et al. v. Banks et al.,* 34 Ga. 407.

As to enforcement of gambling transactions legal in the jurisdiction where they occurred but illegal in the forum state, it is said:

"Although there is a marked conflict of authority on the point, some courts regard statutes declaring gambling contracts and transactions illegal or void as embodying a distinctive public policy which requires the courts of the state in which they are enacted to refuse to recognize or enforce any contract or transaction in violation of their terms, even though such contract or transaction may have had its situs outside the forum by the laws of which situs it is valid, and therefore does not come within the direct operation of the statutes. The practical result of the adoption of this view is, of course, that a gambling or wagering contract, in order to be upheld or enforced, must be valid both by its proper law— that is, by the law of its situs—and by the law of the forum."

38 Am.Jur.2d § 195, p. 246. See also the annotation in 173 A.L.R. 696.

### III

■ While no Georgia case bears any factual kinship to what we have here, it would take very long odds to induce this Court to wager that our appellate courts would override the strong public policy expressed by statute and judicial decision as to enforcement of gambling contracts. Unawed, however, by the bristling battlements of the Georgia ethos, counsel for plaintiff rides boldly up to the portcullis and throws down his gauntlet.

There is, indeed, a marked conflict of authority in this country on the point. Plaintiff cites *Intercontinental Hotels Corporation v. Golden,* 15 N.Y.2d 9, 254 N.Y. S.2d 527, 203 N.E.2d 210 where the Court allowed a recovery on a check and on I.O. U.'s given by a resident of New York who had lost $12,000 playing at a dice table in Puerto Rico where gambling is legitimate. The same result was reached in 1973 by the Supreme Court of New Jersey in *Hilton Hotel v. Toland,* 63 N.J. 301, 307 A.2d 85. Although casino gambling is a crime in New Jersey, it was held that a gambling debt incurred in Puerto Rico was enforceable in the forum State in which the debtor resided. The Court found that gambling was not so offensive to the public policy of New Jersey as to preclude recovery on such a debt. See also case comment, "Public Policy and Conflict of Laws—Foreign Gambling Debts Collectable in New Jersey", 27 *Rutgers Law Review* (Winter, 1974), 327.

Plaintiff also cites *Caribbean Mills, Inc. v. McMahon,* 332 F.2d 641 (10th Cir.), affirming 217 F.Supp. 639. In that case a suit was brought on promissory notes representing the purchase price of a gambling casino and hotel in Haiti. Allowance of a recovery by plaintiff was based on the fact that the negotiable instruments involved were purchased by a party who was a holder in due course without notice of infirmity. We do not have that situation in the instant case.

Apparently there has been a ferment and revision of thinking by the American Law Institute since publication of the first edition of Restatement, Conflict of Laws. In § 612 the following illustration was given: "By the law of state X, gambling debts may be recovered; by the law of state Y, to allow recovery on such debts would be against public policy. A sues B in Y on a gambling debt incurred in X. Judgment for B." The second edition drops the illustration. It is stated that the effect of illegality of a contract is to be determined by choice-of-law standards based on contacts in determining "the state of most significant

relationships", according consideration to relevant policies and interests of the states concerned. Restatement, Conflict of Laws Second § 202, § 188. In line with these choice-of-law concepts plaintiff argues:

"Nevada has a strong interest in enforcing gambling debts incurred in its jurisdiction and that the debt was contracted there is significant in this case. Furthermore, Georgia has an interest in protecting the justified expectations of the parties, the freedom to contract, and the security of commercial transaction. Nevada also shares these interests. Also, by applying Nevada law we do not violate Georgia public policy in that the rationale behind the policy has nothing to do with gambling in Nevada. This is especially true in light of the proposition that the purpose behind the Georgia public policy against gambling is to protect people in Georgia and to keep gambling out of Georgia. Therefore, Georgia law would not be advanced by applying it in this case because the transaction had nothing to do with Georgia."

## IV

Until the adoption of the Uniform Commercial Code, the law of this State in respect to the validity of promissory notes was controlled by the law of the place where they are executed and not where same are payable. *Jackson v. American Mortgage Co.,* 88 Ga. 756, 15 S.E. 812; *Stansell v. Georgia Loan & Trust Co.,* 96 Ga. 227, 22 S.E. 898; *Cf.* 11 Am.Jur.2d Bills and Notes, §§ 94, 97, p. 135, n.3; Restatement, Conflict of Laws Second § 214(2); 10 C.J.S. Bills and Notes § 61, p. 494.

These "conflict" principles pre-date Georgia's Uniform Commercial Code. The latter provides that where the parties have selected no choice of law the Act "applies to transactions bearing an appropriate relation to this State". Ga.Code Ann. § 109A–105(1). "This means," a commentator has said, "that notwithstanding a contract has been entered into in another state, if it is litigated in Georgia and bears an 'appropriate relation' to Georgia, its validity will be governed by Georgia law." Walling, "Comparison of Uniform Commercial Code with Georgia Law" (1961).

Pursuant to that principle, the General Assembly in enacting UCC repealed that portion of Section 102–108 of the Georgia Code which provided that "The validity, form, and effect of writings and contracts are determined by the laws of the place where executed." Ga.Laws, 1963, pp. 188, 205; Ga.Code Ann. § 102–108(8). However, there has been no repeal or modification of the principle that enforcement of the laws of another state is not required where they run counter to the public policy of Georgia. In diversity cases involving that issue the governing law is that of the state in which the federal court is sitting. *Griffin, Administrator v. McCoach, Trustee,* 313 U.S. 498, 507, 61 S.Ct. 1023, 85 L.Ed. 1481.

Unimpaired is the rule that this State does not have to recognize and enforce the laws of another state deemed obnoxious to its public policy. In enforcing comity in respect to the laws of sister states, Georgia does so only "so long as its enforcement is not contrary to the policy . . . of this State." Ga.Code Ann. § 102–110(9); *Tillman v. Gibson,* 44 Ga.App. 440, 442–443, 161 S.E. 630; *Delta Air Lines, Inc. v. McDonnell Douglas Corporation,* D.C., 350 F.Supp. 738, 742. It is abundantly clear that gambling transactions contravene the public policy of Georgia and constitute obligations unenforceable in its courts.

Defendant's motion for summary judgment must be granted and judgment will be entered accordingly.