In re Homer W. SMITH, Virginia C. Smith, Debtors.

Bankruptcy No. 83–A–1016.

United States Bankruptcy Court,
D. Maryland,
at Rockville.

Oct. 16, 1986.

Melvin Feldman, Rockville, Md., for Chapter 7 Trustee.

Arthur Brisker, Rockville, Md., for GNAC Corp.

### MEMORANDUM OF DECISION

(Trustee's Objection to Claim)

PAUL MANNES, Chief Judge.

Melvin M. Feldman, trustee of the Chapter 7 estate, has filed an objection to the claim of GNAC Corp. The objection states in its entirety:

For objection to the claim of GNAC Corp. the Trustee states:

1. GNAC Corp. filed a claim of $15,-000.00.

2. The claim of GNAC Corp. is for gambling and/or wagering which is illegal and/or unenforceable in Maryland.

WHEREFORE, it is prayed that the claim of GNAC Corp. be disallowed and stricken.

The claim of GNAC Corp. (Golden Nugget Casino Hotel) (sometimes hereinafter "the Casino") is based upon an advance of $15,000 in chips used in connection with legalized casino gambling activities at the Golden Nugget Casino in Atlantic City, New Jersey. The claim is evidenced by three checks made payable to GNAC Corp. drawn on debtor Homer Smith's bank account in United Bank & Trust Company of Waldorf, Maryland. These checks, all issued on September 29, 1982, were not honored by United Bank and bore the notation, "Refer to maker."

The trustee argues that Maryland's comprehensive gaming statute, MD.ANN. CODE art. 27, §§ 237 *et seq.* (1976), reflects a clear legislative intent to preclude enforcement of gambling transactions even when occurring in a state where they are legal. The trustee cites two sections of the statute as indicative of the strong public policy in Maryland against gambling:

§ 243. *Losses recoverable; winnings not recoverable.*

Any person who may lose money at a gaming table may recover back the same as if it were a common debt, and shall be a competent witness to prove the sum he lost; but no person shall recover any money or other thing which he may have won by betting at any game or by betting in any manner whatsoever.

§ 246. *Construction of sections relating to gambling and betting.*

The courts shall construe the preceding sections relating to gambling and betting liberally, so as to prevent the mischiefs intended to be provided against.

The issue to be determined is whether a defense grounded upon the public policy of the forum in which the bankruptcy court

sits was intended by Congress [1] to be within the term "applicable law" in the operative Code section, 11 U.S.C. § 502(b):

> § 502  *Allowance of claims or interests.*[2]
>
> \*     \*     \*     \*     \*     \*
>
> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as in the lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (1) such claim is unenforceable against the debtor, and unenforceable against property of the debtor, under any agreement or *applicable law* for a reason other than because such claim in contingent or unmatured. (Emphasis added.)

To decide the issue stated above, the court believes that section 502(b) must be viewed in the light of the following language from *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 162–63, 67 S.Ct. 237, 240, 91 L.Ed. 162 (1946):

> In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, has no such implication. That case decided that a federal district court acquiring jurisdiction because of diversity of citizenship should adjudicate controversies as if it were only another state court. See Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582. But bankruptcy courts must administer and enforce the Bankruptcy Act as interpreted by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed under equitable principles.

329 U.S. at 162–63, 67 S.Ct. at 240.

The instant case involves an unsecured claim. The court believes without hesitation that had the debt incurred by the debtor been reduced to judgment in a New Jersey court, 28 U.S.C. § 1738 would require full faith and credit be given to such judgment. This is because of the common law principle that once litigation is pursued to judgment, the judgment shall be as conclusive of the rights of the parties in every other court as in the court where the judgment was rendered. *Robert Wood & Wire Products Corp. v. Narnaco Industries, Inc.,* 797 F.2d 176, 178 (4th Cir.1986). The Supreme Court has held in numerous cases that credit must be given to the judgment of another state, although the forum would not be required to entertain the suit on which the judgment was founded. *Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 277, 56 S.Ct. 229, 234, 80 L.Ed. 220 (1935). Included within this mandate are judgments rendered upon gambling contract suits. *Fauntleroy v. Lum,* 210 U.S. 230, 28 S.Ct. 641, 52 L.Ed. 1039 (1908).

---

**1.** H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 352 (1977), U.S.Code Cong. & Admin.News 5787, provides in pertinent part:

Subsection (b) prescribes the grounds on which a claim may be disallowed. The court will apply these standards if there is an objection to a proof of claim. The burden of proof on the issue of allowance is left to the Rules of Bankruptcy Procedure. Under the current Chapter XIII Rules, a creditor is required to prove that his claim is free from usury, Rule 13–301. It is expected that the Rules will make similar provision for both liquidation and individual repayment plan cases. *See* Bankruptcy Act § 656(b); H.R. 31, 94th Cong., 1st Sess., § 6–104(a) (1975).

Paragraph (1) requires disallowance if the claim is unenforceable against the debtor for any reason (such as usury, unconscionability, or failure of consideration), other than because it is contingent or unmatured. All such contingent or unmatured claims are to be liquidated by the bankruptcy court in order to afford the debtor complete bankruptcy relief; these claims are generally not provable under present law.

**2.** The rule of decision in this case is governed by the 1978 version of the Bankruptcy Code. However, the 1984 amendments do not work any substantial change and the result would be the same.

The obligation of the debtor was in all respects legally contracted. The debtor was accredited by the casino and, upon the issuance of his checks, $15,000 worth of gambling chips were handed over to him. Under local New Jersey gambling regulations, the chips were not usable in any other casino and could not be removed lawfully from the casino. While the court has the impression that debtor would not be able to cash in the chips without paying off the indebtedness, there is nothing in the record to support that impression.

Resolution of the presented controversy involves two separate questions: whether recognition of the GNAC claim would be contrary to the public policy of the State of Maryland; and, if the answer to this question is in the affirmative, does Maryland law govern claims such as these in federal bankruptcy proceedings? ·

The court is being called upon by the trustee to interpret Maryland law. The court will take judicial notice that there has been a change in public attitude of a substantial body of the Maryland citizenry and the legislature with respect to gambling as evidenced by the Maryland State lottery that produces a significant amount of revenue for the state budget, pari-mutuel betting at thoroughbred and harness races, and lawful bingo games in Anne Arundel, Kent, Calvert, Carroll, Frederick, Worcester, Baltimore, Charles, Montgomery, Harford, Washington, and Wicomico Counties and Baltimore City.[3] Because of this perceived change in public attitude, the court doubts that there remains any vitality to the case relied upon by the trustee in *Spies v. Rosenstock*, 87 Md. 14, 39 A. 268, 270 (1898), or to *Emerson v. Townsend*, 73 Md. 224, 20 A. 984, 985 (1890) (according to provisions of statute 9 Anne c. 14,[4] a note is utterly void where even a part of the consideration was for money loaned in advance for gambling purposes).

The court's research has not disclosed any case where Maryland appellate courts have come to grips with a case involving the collection of a gambling debt incurred in a jurisdiction with legalized gambling. The court finds nothing in the announced public policy of the State that would bar collection by GNAC of the checks in question and provide a defense to the action. *Cf. Intercontinental Hotels Corp. v. Golden*, 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964).[5] The court in so doing

---

**3.** Within Maryland it remains illegal to keep a gaming table or place. No winner may avail himself of the courts to recover. *See generally* "GAMING" MD.ANN.CODE art. 27, §§ 237–246 (1976); *Cates v. State*, 21 Md.App. 363, 320 A.2d 75, 80–81 (1974) *cert. denied.*

**4.** In *Hamilton v. Blankenship*, 190 A.2d 904 (D.C.App.1963), relied upon by the trustee, the District of Columbia Court heard the suit of a plaintiff, a restaurant owner in Waldorf, Maryland, who loaned money to the defendant to play the slot machines in a restaurant. Plaintiff made the loan with the knowledge of the purpose for which the money was to be used. The District of Columbia Code § 16–701 prohibited judicial enforcement of gaming transactions regardless of their validity in the place where made.
In affirming the judgment for defendant, the Court of Appeals concluded that the plaintiff had no valid contract in the State of Maryland where the transaction occurred and that he would have been denied relief in the courts of Maryland. Speaking for the court, Chief Judge Hood stated:
Ordinarily a contract valid where made will be enforced in the courts of another jurisdiction without regard to whether it would have been valid under the law of the forum. Exception is made to the general rule when enforcement of the contract would contravene the public policy of the forum. This exception should be applied sparingly and before considering its application here, it is proper to first determine whether the contract was enforceable under Maryland law.
*Hamilton*, 190 A.2d at 904–05. *Hamilton* indicates that the forum court should look to the enforceability of the contract under the law of its situs. The contract before the court is legal in New Jersey. An analogy may be made with the common-law marriage that may not be contracted in Maryland. Nevertheless, where a valid common-law marriage has been entered into in a jurisdiction recognizing the validity of such a marriage, it is recognized as valid in Maryland. *See Jennings v. Jennings*, 20 Md.App. 369, 315 A.2d 816, 819 (1974) *cert. denied.*

**5.** Cases have been cited by counsel on both sides dealing with the rule of whether or not the rule of the forum precludes enforcement of a gambling transaction valid were made. These and many others have been collected in *Annotation,*

is not unmindful of the controls that a state or territory may exercise over casino gambling to protect the health, safety, and welfare of its citizens. *See Posadas de Puerto Rico Associates, d/b/a Condado Holiday Inn v. Tourism Company of Puerto Rico,* — U.S. ——, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).

Even were the Maryland Court of Appeals to deny enforcement in Maryland courts of obligations such as the one under consideration, in the case at hand the claim is to be judged under the equitable principles of the Bankruptcy Code. *See Vanston,* 329 U.S. at 162–63, 67 S.Ct. at 240. The phrase "applicable law" in section 502(b) deals with the law of the place of the making of the contract, not of the forum, unless the parties indicate otherwise. The House Report, quoted in footnote 1, explains this in describing such applicable defenses as usury, unconscionability, and failure of consideration. These are defenses of dealing with the making of the contract. Such defenses bearing upon the execution, interpretation, and validity of the contract depend upon the place the contract was made, unless the parties indicate other-

*Gambling Transaction Valid Where Made,* 71 ALR 3rd 178 (1976).

One of the best discussions of the question appears in the case of *Intercontinental Hotels v. Golden.* Plaintiff sought recovery of a check and I.O.U.'s given in payment of gambling debts incurred in Puerto Rico. The New York court was asked to deny enforcement of the claim as contrary to the public policy of the forum. The court stated:

Public policy is not determinable by mere reference to the laws of the forum alone. Strong public policy is found in prevailing social and moral attitudes of the community. In this sophisticated season the enforcement of the rights of the plaintiff in view of the weight of authority would not be considered repugnant to the "public policy of this State". It seem to us that, if we are to apply the strong public policy test to the enforcement of the plaintiff's rights under the gambling laws of the Commonwealth of Puerto Rico, we should measure them by the prevailing social and moral attitudes of the community which is reflected not only in the decisions of our courts in the Victorian era but sharply illustrated in the changing attitudes of the People of the State of New York. The legalization of pari-mutuel betting and the operation of bin-

wise. *See generally Keco Industries, Inc. v. ACF Industries, Inc.,* 316 F.2d 513, 514 (4th Cir.1963); *In re Parkwood, Inc.,* 461 F.2d 158, 171 (D.C.Cir.1971).

The court concludes that the public policy of the forum does not provide a basis for denying claims based on contracts ancillary to gambling activities valid where executed. An order will be entered overruling the objection of the trustee to the claim of GNAC Corp.

go games, as well as a strong movement for legalized off-track betting, indicate that the New York public does not consider authorized gambling a violation of "some prevalent conception of good morals [or], some deep-rooted tradition of the common weal." (*Loucks v. Standard Oil Co., supra,* p. 111, 120 N.E. p. 202).

The trend in New York State demonstrates an acceptance of *licensed* gambling transactions as a morally acceptable activity, not objectionable under the prevailing standards of lawful and approved social conduct in a community. Our newspapers quote the odds on horse races, football games, basketball games and print the names of the winners of the Irish Sweepstakes and the New Hampshire lottery. Informed public sentiment in New York is only against unlicensed gambling, which is unsupervised, unregulated by law and which affords no protection to customers and no assurance of fairness or honesty in the operation of the gambling devices.

In the present case there is no indication that the evils of gambling, which New York prohibits and Puerto Rico has licensed, will spill over into our community if these debts are enforced in New York courts.