535 A.2d 466

**Richard E. KRAMER**

v.

**BALLY'S PARK PLACE, INC.**

**No. 8, Sept. Term, 1986.**

Court of Appeals of Maryland.

Jan. 11, 1988.

Benjamin Lipsitz, Baltimore, for appellant.

Neal S. Melnick (Melvyn J. Weinstock, Richard M. Kind and Weinberger, Weinstock, Sagner, Stevan & Harris, P.A., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH [*], ELDRIDGE, COLE, RODOWSKY, COUCH [*] and McAULIFFE, JJ.

ELDRIDGE, Judge.

The question in this case is whether Maryland courts should enforce a gambling contract, made in another state where the type of gambling engaged in is lawful and the contract is enforceable, when the type of gambling is illegal in Maryland.

## I.

On October 29, 1981, while in Atlantic City, New Jersey, Richard E. Kramer wrote a check in the amount of $5,000, drawn upon the Maryland National Bank, and payable to Bally's Park Place, Inc. The check was dishonored, and Bally's sued in New Jersey to recover from Kramer. On March 9, 1984, the New Jersey Superior Court rendered a default judgment in favor of Bally and against Kramer for $6,350.

Thereafter, Bally's filed a complaint in the Circuit Court for Baltimore County accompanied by a motion for summary judgment. The complaint set forth two alternative grounds for relief. First, Bally's sought to enforce the New Jersey judgment against the defendant. Second, Bally's sought to recover on the underlying contract and debt.

Kramer opposed the motion for summary judgment, maintaining that Bally's claim depended upon the resolution of certain material facts. Specifically, Kramer stated in an affidavit that he "was not served with process in said New

---

[*] Smith and Couch, JJ., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

Jersey action prior to entry of [the] default judgment against him." If he had not been served, the New Jersey court would have lacked jurisdiction over Kramer and its judgment would be unenforceable. Kramer also asserted that the "consideration for the alleged obligation on which said New Jersey action is sought to be based, viz., alleged gambling debts, is not recognized as a legal or valid consideration in the State of Maryland." Kramer argued that the court, in order to determine whether Bally would be entitled to judgment on the underlying contract, would have to resolve whether the obligation was a gambling debt. Kramer did not, however, dispute the existence of the debt itself; he asserted that "[a]ny alleged debt which the plaintiff, Bally's Park Place, Inc., claims I owe it is a gambling debt."

After a hearing, the circuit court granted Bally's motion for summary judgment and entered judgment in favor of Bally for $6,350. Kramer appealed to the Court of Special Appeals. Before the case was heard by the intermediate appellate court, this Court issued a writ of certiorari.

## II.

Preliminarily, we note that because the trial court granted Bally's motion for summary judgment, we view the facts, including all inferences, in the light most favorable to Kramer, the nonmoving party. *Natural Design, Inc. v. Rouse Co.,* 302 Md. 47, 62, 485 A.2d 663, 671 (1984), and cases there cited. Thus, for purposes of this appeal, we must assume that Kramer wrote the check to Bally's in order to gamble, or as a result of gambling losses, and as such, the check represents consideration under a gambling contract or payment of a gambling debt. Additionally, for present purposes, we must assume that Kramer was not served in the New Jersey action and that, therefore, the New Jersey judgment is unenforceable in Maryland. Consequently, the grant of summary judgment can be sustained only on the underlying contract action and only if out-of-state gambling debts, valid where made, are enforceable in this State.

### III.

When determining which law controls the enforceability and effect of a contract, this Court generally applies the principle of *lex loci contractus*. Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction. *Bethlehem Steel v. G.C. Zarnas Co.*, 304 Md. 183, 188, 498 A.2d 605, 607 (1985); *Traylor v. Grafton*, 273 Md. 649, 660, 332 A.2d 651, 659 (1975); *Dakin v. Pomeroy*, 9 Gill 1, 6 (1850). It is uncontested that if New Jersey law applies, Bally may successfully recover on the gambling contract.[1]

■ Occasionally, however, the *lex loci contractus* principle will not be applied. Thus, under certain circumstances, Maryland courts will not enforce an out-of-state contract provision which is against Maryland public policy. *See, e.g., Bethlehem Steel v. G.C. Zarnas & Co., supra*, 304 Md. at 188–189, 498 A.2d 605, 607–608 (1985), and cases there cited; *Traylor v. Grafton, supra*, 273 Md. at 660, 332 A.2d at 659; *Henderson v. Henderson*, 199 Md. 449, 458–459, 87 A.2d 403, 409 (1952). Nevertheless, for Maryland public policy to override the *lex loci contractus* rule, the public policy must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction. *Bethlehem Steel, supra*, 304 Md. at 189, 498 A.2d at 608. *See, Texaco v. Vanden Bosche*, 242 Md. 334, 340–341, 219 A.2d 80, 83–84 (1966). *See also Harford Mutual v. Bruchey*, 248 Md. 669, 674, 238 A.2d 115, 117 (1968).

---

**1.** Kramer does not challenge the validity of the gambling debt under New Jersey law. In *Bethlehem Steel*, 304 Md. 183, 498 A.2d 605 (1985), we noted that Pennsylvania law merely tolerated the indemnification provision prohibited by Maryland law. The New Jersey legislature, however, legalized casino gambling in the Casino Control Act, 1977 N.J. Laws, c. 110, *codified in* N.J.Stat.Ann. § 5:12–1 et seq. (West 1987 Cum.Supp.). Under § 5:12–101, casinos may extend credit and may accept checks to enable someone to take part in gaming activities. This section requires casinos to follow certain formalities in accepting checks and also regulates the manner in which debts and bad checks may be collected.

In *Bethlehem Steel v. G.C. Zarnas & Co., supra,* we recently reviewed the public policy exception to the *lex loci contractus* principle. That case involved a construction contract, executed in Pennsylvania, in which the "promisor agreed to indemnify the promisee against liability for damages resulting from the sole negligence of the promisee." 304 Md. at 185, 498 A.2d at 606. In that case we held that the contract provision was so contrary to Maryland's statutorily declared public policy that it was unenforceable in our courts. In analyzing the public policy underlying the pertinent Maryland statute, we stated (304 Md. at 190, 498 A.2d at 608):

> "This is not a situation where Maryland law is simply different from the law of another jurisdiction. Here, the General Assembly of Maryland has specifically addressed clauses in construction contracts providing for indemnity against the results of one's sole negligence, and has unequivocally told the Maryland judiciary that such a clause 'is void and unenforceable.' § 5–305 of the Courts and Judicial Proceedings Article. Moreover, in the same sentence of the statute, the General Assembly expressly stated that such indemnity provision 'is against public policy.' Unless there is a contrary indication elsewhere, and absent constitutional considerations, the General Assembly's explicit determination of public policy is sufficient in a case like this to override the *lex loci contractus* principle."

Moreover, we noted in *Bethlehem Steel* that "the parties contracted in Pennsylvania to do something which Pennsylvania law merely tolerates. No Pennsylvania statute expressly creates a right of the parties to so contract. On the other hand, a Maryland statute specifically forbids, on public policy grounds, the enforcement of a contractual agreement such as that involved here." 304 Md. at 191, 498 A.2d at 609. Thus this Court decided in *Bethlehem Steel* that Maryland's public policy against certain indemnification agreements was sufficiently strong, when compared to Pennsylvania's interest in the outcome, to justify applying

the law of the forum, and not the law of the jurisdiction where the contract was formed.

The parties in the present case have proceeded on the assumption that Maryland law would preclude enforcement of the contract or debt had it been entered into in Maryland. Assuming arguendo that this is correct, the question, then, is whether the New Jersey contract is so violative of Maryland public policy that a Maryland court should refuse to apply New Jersey law.[2]

## IV.

 In order to determine whether Maryland public policy is so strong as to preclude application of New Jersey

---

2. While we make this assumption about Maryland law for purposes of this decision, it is not at all clear that a contract entered into in Maryland, to engage in a form of gambling which is lawful in the area in which it is to be performed, but which would be illegal gambling if performed in Maryland, would be unenforceable under Maryland law. The Maryland cases refusing to enforce contracts of this type have all involved gambling activities that were illegal in Maryland where the gambling took place. *See, e.g., Emerson v. Townsend,* 73 Md. 224, 20 A. 984 (1890); *Gough v. Pratt,* 9 Md. 526 (1856). On the other hand, in *Bender v. Arundel Arena,* 248 Md. 181, 236 A.2d 7 (1967), which involved a form of gambling legal in some counties of Maryland but illegal in others, this Court held that a gambling contract, entered into in a Maryland county where the form of gambling was legal, was enforceable. It is by no means clear, in light of *Bender,* that Maryland law would preclude enforcement of a gambling contract that is entered into in an area where the form of gambling is illegal, but is to be performed in an area where the form of gambling is legal. If a contract is entered into or a debt is incurred in Maryland relating to a particular form of gambling, unlawful where the contract was made, but lawful in the county or state where the contract was to be performed, it may well be as a matter of Maryland law that the contract is enforceable.

If Maryland law would not preclude enforcement of the contract under these circumstances, there really is no conflict between Maryland law and New Jersey law. Thus, the question of whether Maryland's public policy is so strong as to preclude application of New Jersey law would not logically arise. We need not rule on this matter in this case. Rather, as pointed out above, we will assume that Maryland public policy would preclude enforcement of the contract in the present case had it been entered into in Maryland although the gambling was to take place in New Jersey.

law, we first review the pertinent Maryland law concerning enforcement of gambling contracts and debts. In our view, the relevant judicial opinions and statutes do not represent a public policy so strongly opposed to gambling or gambling debts that it overrides the *lex loci contractus* principle.

The current statutory provision relating to the enforcement of gambling debts or contracts is found in Maryland Code (1957, 1982 Repl. Vol.), Art. 27, § 243. With § 243, the General Assembly has provided a civil remedy that allows the gambler to recover any money lost but prohibits recovery of money won.[3]

The early cases applying what is now § 243 all involved forms of gambling that were, at the time, illegal in Maryland. In these cases, this Court applied § 243 literally,

---

**3.** Section 243 provides,

"Any person who may lose money at a gaming table may recover back the same as if it were a common debt, and shall be a competent witness to prove the sum he lost; but no person shall recover any money or other thing which he may have won by betting at any game or by betting in any manner whatsoever." Section 243 incorporates the provisions of the Statute of Anne, 9 Anne, c. 14 (1710), *reprinted in* 2 Alexander's British Statutes 932 (Coe's Edition 1912). 9 Anne, c. 14 is a part of Maryland common law. *Gough v. Pratt*, 9 Md. 526 (1856); Kilty's Report of English Statutes 248 (1811).

Gambling activities were virtually unrestricted in Maryland until the enactment of the Statute of Charles, 16 Charles 2, c. 7 (1664), *reprinted in* 2 Alexander, British Statutes, *supra*, 643. The Statute of Charles did not, however, outlaw gambling. Rather, it merely attempted to prohibit excessive gambling. A person could lose any amount of "ready money" and up to one hundred pounds in credit. For losses (other than in ready money) "above said Sum of one hundred Pounds, [the person] shall not in that Case be bound ... to pay or make good the same." The statute also provided that persons winning amounts in credit of over 100 pounds "shall forfeit ... treble the Value of such ... Sums of Money."

9 Anne, c. 14 took a more prohibitory approach toward gambling while still not outlawing it. This statute declared "utterly void" all gambling debts where any part of the consideration was for money "won by gaming or playing at Cards, Dice, Tables, Tennis, Bowls or Other Game or Games." In addition the statute provided that persons losing money from gambling activities in excess of ten pounds "shall be at Liberty, within three months then next to sue for and recover the Money or Goods so lost."

voiding debts created through gambling. In *Emerson v. Townsend*, 73 Md. 224, 20 A. 984 (1890), a promissory note was given in payment of a gambling debt incurred at an illegal poker game, and this Court held that, under the statute, the note was "utterly void." 73 Md. at 227, 20 A. at 985. *LaFontaine v. Wilson*, 185 Md. 673, 45 A.2d 729 (1946), was a suit to recover the plaintiff's losses of about $46,000 at various forms of illegal gambling, including dice and roulette, and the court held that under what is now § 243, the plaintiff could recover the money lost. *See also Gough v. Pratt*, 9 Md. 526, 535 (1856); *Hook v. Boteter*, 3 H. & McH. 348 (1793).

In *Bender v. Arundel Arena*, 248 Md. 181, 236 A.2d 7, 11 (1967), however, this Court construed § 243 to be inapplicable to *legal* forms of gambling. The gambling losses in *Bender* occurred at "amusement devices" licensed by the County Commissioners of Anne Arundel County under Ch. 321 of the Acts of 1941. Subsequently, Ch. 321 of the Acts of 1943 empowered the County Commissioners to designate permissible types of amusement devices and also to permit the issuance of any prize or award for skill or score attained. The plaintiffs in *Bender* sought to recover for money lost at commercial bingo games and coin-operated gambling devices licensed by the Anne Arundel County Commissioners. The Court held that, even though the acts legalizing the gambling did not expressly repeal § 243, "[t]he legislature must be deemed to have made § 243 of Art. 27 of the Code unavailable to one who gambles ... at a licensed gambling establishment." *Ibid.* Thus, the court held that § 243 could not be invoked by someone who lost at legal gaming activities.

*Bender* establishes that Maryland public policy concerning the enforceability of gambling debts and contracts largely depends on whether the type of gambling engaged in is legal or illegal.[4] When § 243 is considered in light of

---

4. In this respect, Maryland law relating to the enforceability of gambling debts differs from the approach taken by some other state courts

*Bender,* it is clear that the statute differs significantly from the statute at issue in *Bethlehem Steel v. G.C. Zarnas & Co., supra.* The statute in *Bethlehem Steel,* § 5–305 of the Courts and Judicial Proceedings Article, unequivocally told the Maryland judiciary that certain indemnification provisions were "void and unenforceable" and expressly stated that such provisions are "against public policy." 304 Md. at 190, 498 A.2d at 608.

Moreover, under *Bender,* many types of gambling debts are enforceable as a matter of Maryland law. This is because several forms of gambling are legal in Maryland. Currently statutes authorize bingo and other gambling games in numerous subdivisions of the State. *See, e.g.,* Code (1957, 1982 Repl. Vol., 1987 Cum.Supp.), Art. 27, §§ 255A through 261D. Some of the statutes are written in broad terms authorizing, under certain conditions, many types of gambling activities, including bingo, raffles, chance books, "paddle wheels," "wheels of fortune," "card parties," and games of skill. Section 255 of Art. 27 also broadly authorizes various gambling activities in numerous counties by volunteer fire companies or by fraternal, civic, war veterans', religious or charitable institutions. *See American Legion v. State,* 294 Md. 1, 447 A.2d 842 (1982). *But see State v. 149 Slot Machines,* 310 Md. 356, 529 A.2d 817 (1987) (holding that the language of § 255(b), legalizing certain forms of gambling, including "any other gaming

---

that have held that public policy even precludes enforcement of contracts relating to legal gambling. *See Sandler v. Eighth Jud. Dist. Court, Etc.,* 96 Nev. 622, 624, 614 P.2d 10, 11 (1980) (changed by later statutory enactment, Nev.Rev.Stat. § 463.368 (1983)). *See also, Lane & Pyron, Inc. v. Gibbs,* 266 Cal.App.2d 61, 65, 71 Cal.Rptr. 817, 819 (1968) (Debt incurred in Nevada where gambling is legal. "[T]he courts of Nevada as well as California refuse to lend their process to the collection of gambling debts"). *Cf. Hamilton v. Blankenship,* 190 A.2d 904 (D.C.App.1963), in which the District of Columbia Court of Appeals purportedly applied Maryland law to void a gambling debt incurred through playing slot machines, which at that time was legal in Maryland. This case, however, arose before this Court's decision in *Bender, supra,* and is inconsistent with *Bender*'s holding regarding Maryland law.

device," does not exempt slot machines from other statutory provisions that outlaw slot machines). *See also* Code (1957, 1982 Repl. Vol., 1987 Cum.Supp.), Art. 27, § 264B (paragraph VI) (authorizing, effective July 1, 1987, nonprofit organizations to own and operate no more than five slot machines under certain conditions in eight counties of the State).

Also, in 1972, the Maryland Constitution was amended to allow "a lottery to be operated by and for the benefit of the State." Art. III, § 36. Since that time, the State has been extensively involved in the management and operation of various types of lotteries. *See, e.g.,* Code (1984, 1987 Cum. Supp.), § 9–101 through 9–125 of the State Government Article. Additionally, the State has long authorized betting upon licensed horse racing. The State Racing Commission was established in 1920, Ch. 273 of the Acts of 1920. *See also* Code (1957, 1980 Repl. Vol., 1987 Cum.Supp.), Art. 78B; *James & Gamble v. State,* 63 Md. 242 (1884).[5]

In light of the *Bender* holding, and the extent of legal gambling in Maryland, we cannot conclude that there is a sufficiently strong Maryland public policy against gambling debts that would justify disregarding the *lex loci contractus* principle.

Additionally we note that other states that have addressed this issue have reached a similar conclusion. For example, in *Intercontinental Hotels Corp. v. Golden,* 15 N.Y.2d 9, 203 N.E.2d 210, 254 N.Y.S.2d 527 (1964), the Court of Appeals of New York reasoned (15 N.Y.2d at 14–15, 203 N.E.2d at 212–213, 254 N.Y.S.2d at 530–531):

"Public policy is not determinable by mere reference to the laws of the forum alone. Strong public policy is

---

**5.** For information concerning the prevalence and type of gambling on horse races in colonial Maryland, *see* Robertson, *The History of Thoroughbred Racing in America,* Prentice–Hall, Inc., Englewood Cliffs, New Jersey (1964); Scharf, *History of Maryland,* Vol. II, Tradition Press, Hatkova, Pennsylvania (1967); Culvel, *Blooded Horses of Colonial Days,* Baltimore, Maryland (1922); Land, *Colonial Maryland,* KTO Press, Millwood, New York (1981).

found in prevailing social and moral attitudes of the community. In this sophisticated season the enforcement of the rights of the plaintiff in view of the weight of authority would not be considered repugnant to the 'public policy of this State.' ... The legalization of parimutuel betting and the operation of bingo games, as well as a strong movement for legalized off-track betting, indicate that the New York public does not consider authorized gambling a violation of 'some prevalent conception of good morals [or], some deep-rooted tradition of the common weal.' " ...

"The trend in New York State demonstrates an acceptance of *licensed* gambling transactions as a morally acceptable activity, not objectionable under the prevailing standards of lawful and approved social conduct in the community.... Informed public sentiment is only against unlicensed gambling, which is unsupervised, unregulated by law and which affords no protection to customers and no assurance of fairness or honesty of the operation of the gambling devices."

Similarly, the New Jersey Supreme Court, in *Caribe Hilton Hotel v. Toland*, 63 N.J. 301, 307, 307 A.2d 85, 88 (1973), stated that "[w]hile New Jersey continues to take a strict view of those forms of gambling that are prohibited, the fact that wagering in various different ways is now authorized demonstrates that our public policy can no longer be said to condemn gambling *per se.*" *See also, Castilleja v. Camero*, 414 S.W.2d 424 (Texas 1967) (holding that the place of performance governs the legality of the contract, and, because the contract was to be performed in Mexico, Texas public policy against gambling was not implicated); *In re Smith*, 66 B.R. 58 (Bankr.D.Md.1986), *aff'd*, 77 B.R. 33 (D.Md.1987).[6]

---

**6.** We recognize that a number of courts have refused to enforce out-of-state gambling contracts, holding that to do so would violate the public policy of the forum. *See, e.g., Condado Aruba Caribbean Hotel v. Tickel*, 39 Colo.App. 51, 53, 561 P.2d 23, 24 (1977); *Casanova Club v. Bisharat*, 189 Conn. 591, 458 A.2d 1 (1983); *Dorado Beach*

We therefore hold that Maryland courts will enforce a gambling debt incurred in another state where the gambling is legal and the debt enforceable. Consequently, the circuit court properly granted Bally's motion for summary judgment.

JUDGMENT AFFIRMED, WITH COSTS.

*Hotel Corp. v. Jernigan,* 202 So.2d 830 (Fla.App.1967), *appeal dismissed,* 209 So.2d 669 (Fla.1968); *Gulf Collateral Inc. v. Morgan,* 415 F.Supp. 319, 320 (S.D.Ga.1976); *Thomas v. First Nat. Bank,* 213 Ill. 261, 267, 72 N.E. 801, 803 (1904); *Maxey v. Railey & Bros. Banking Co.,* 57 S.W.2d 1091 (Mo.App.1933); *Burris v. Witcover,* 158 N.C. 384, 74 S.E. 11 (1912); *Resorts International, Inc. v. Agresta,* 569 F.Supp. 24, 26 (E.D.Va.1983), *affirmed without opinion,* 725 F.2d 676 (4th Cir.1984).